THE PEOPLE *ex rel.* Stephen T. Mather, Appellant, *vs.*
MARSHALL FIELD & Co. *et al.* Appellees.

*Opinion filed February 17, 1915.*

1. MUNICIPAL CORPORATIONS—*authority of cities over streets
depends on their charter powers.* The authority of municipalities
over streets and the uses to which they may legitimately be put,
depends, within constitutional limitations, entirely upon the char-
ter powers of the municipalities granted by the legislature.

2. SAME—*public uses of streets must be extended to meet pub-
lic necessities.* The public uses to which a city street may be ap-
plied cannot be limited by arbitrary rules but must be extended to
meet public wants and necessities occasioned by the enlarged uses
to which the abutting property is devoted.

3. SAME—*what is included in right of travel.* The right of the
public in the city streets necessarily includes every kind of travel
and communication for the movement or transportation of persons
or property which is reasonable and proper; and this includes not
only travel on the surface of the street but below it.

4. SAME—*courts rule more strictly with regard to encroach-
ments above the surface of the street than below it.* With refer-
ence to encroachments in a street the courts rule more strictly
where the encroachments are above the surface of the street than
when they are below it.

5. SAME—*power of city to permit adjacent owners to use the
space beneath street.* A city has the power to permit the owners
of adjacent property to use the space beneath the surface of a
street, even though the fee is in the city, in any manner not incon-
sistent with the public necessities as to street purposes.

6. SAME—*cities have a limited power to declare general policy
as to control of streets.* Cities, within certain general limitations,
have authority to declare the general policy with regard to the
control of their streets, and in the absence of a contrary showing
the Supreme Court will presume that the municipal authorities, in
passing upon matters of this kind, have acted for the best inter-
ests of the city.

7. SAME—*when ordinance granting right to construct tunnels
under street is not ultra vires nor unconstitutional.* An ordinance
granting to a corporation owning mercantile buildings upon both
sides of a street the right to construct tunnels under the street
connecting the basements and sub-basements of the buildings for
the use of employees and the public in passing from one building
to the other and for transporting goods, is not *ultra vires* nor un-

266 — 39

constitutional as granting a special and exclusive privilege to the corporation, where there is no harmful interference with the present public use of such space and the rights of the public as to future use are amply safeguarded by the ordinance, which provides for its revocation, at any time, by the city council without recourse by the corporation, which must then remove the tunnels and restore conditions at its own expense.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN P. MCGOORTY, Judge, presiding. ·

MACLAY HOYNE, State's Attorney, (GEORGE P. MERRICK, of counsel,) for appellant.·

WILLIAM H. SEXTON, Corporation Counsel, and JOSEPH F. GROSSMAN, for appellee the city of Chicago.

TOLMAN & REDFIELD, (EDGAR B. TOLMAN, and JOHN P. WILSON, of counsel,) for appellee Marshall Field & Co.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county dismissing for want of equity an information brought in the name of the People by Maclay Hoyne, State's attorney, upon the relation of Stephen T. Mather, to enjoin the use and occupation of certain passageways or tunnels under Washington street, in the city of Chicago, by Marshall Field & Co. and to restrain the city of Chicago from permitting the sub-surface of Washington street to be so used, and to have a certain ordinance granting such use declared null and void. The trial court certified that, the validity of a municipal ordinance being involved, the public interests required an appeal directly to this court.

The ordinance in question was passed by the city council of Chicago on November 18, 1912. It provides, among other things, as follows:

"Sec. 1. That for the purpose of connecting the basements of the building now standing or hereafter to be

erected upon block thirteen (13) in Fort Dearborn addition to Chicago, with the basement of the building now standing or hereafter to be erected upon lots one (1), two (2) and three· (3)· in block fourteen (14), Fort Dearborn addition to Chicago, and under the east half of Holden court, adjoining said lots one (1), two (2) and three (3), permission and authority be and the same are hereby given and granted to Marshall Field & Co., a corporation, its successors and assigns, (hereafter designated as the grantee,) to excavate, use and occupy a tunnel or passageway under the surface of Washington street, extending from the north to the south curb line thereof, the center line of which tunnel or passageway shall be midway between the west line of Wabash avenue and the east line of Holden court. Said tunnel or passageway shall not exceed eighty (80) feet in width nor fifteen (15) feet in depth below the grade of the street there. That for the purpose of connecting the sub-basements of the buildings now erected or hereafter to be erected on the aforementioned premises, permission and authority are also given and granted to said grantee to excavate, use and occupy a tunnel or passageway under the surface of Washington street from the north to the south curb line thereof, the center line of which tunnel or passageway shall be ten (10) feet east of the center line of Holden court extended across said Washington street. Said tunnel or passageway shall not exceed twenty (20) feet in width nor fourteen (14) feet in height and shall not extend more than twenty-seven (27) feet below the level of the street there. The depth of said passageways shall be computed exclusive of the thickness of the pavement: ᐧ *Provided, however,* that said tunnels or passageways shall not be used at any time for the sale of any goods or merchandise whatsoever.

"Sec. 2. The permission and authority herein granted shall cease and determine twenty (20) years from and after the date of the passage of this ordinance, or may be re-

voked at any time prior thereto by the mayor, in his discretion, without the consent of the grantee herein named. This ordinance shall also be subject to amendment, modification or repeal at any time without the consent of the said grantee, and in case of such repeal all the privileges herein granted shall thereupon cease and determine. In the event of the termination, revocation, amendment or, modification of the authority or privileges hereby granted, by lapse of time, the exercise of the mayor's discretion or the exercise by the city council of the powers above reserved, the grantee, by the filing of the written acceptance hereinafter provided for, shall be understood as consenting that the city shall retain all money it shall have previously received from said grantee under the provisions of this ordinance, said money to be treated and considered as compensation for the authority, permission and privileges enjoyed from the date of the passage of this ordinance until such repeal."

Section 3 provides that the city of Chicago shall be paid a certain compensation by Marshall Field & Co. for the first ten years of said period, and for the last ten years such compensation as may be determined by the city council of said city. Section 4 provides that the work of putting in such tunnel shall be done in accordance with the plans signed by the building commissioner, commissioner of public works and the fire marshal of said city, and under the supervision of the latter two of said officials. Section 5 reads:

"Sec. 5. At the termination of the privileges herein granted, whether by lapse of time, revocation by the mayor or by amendment, modification or repeal by the city council, said grantee shall immediately vacate said Washington street and immediately remove therefrom all construction installed, under authority of this ordinance, below the surface of said street, (including the filling up of the space beneath the street,) and shall place the surface of the street

in condition for use by the public at its own expense, without cost of any kind whatsoever to the city of Chicago; and in the event of the failure, neglect or refusal on the part of said grantee to comply with the provisions of this section of this ordinance the city of Chicago may proceed to remove the same and fill the space and charge the expense thereof to said grantee. Said grantee shall never set up any claim against the city of Chicago which would operate to extend its right to use said space beyond the date of termination of the privileges herein granted by lapse of time, revocation by the mayor or by amendment, modification or repeal by the city council."

Section 6 provides that Marshall Field & Co. shall give a bond of $100,000 to the city of Chicago to secure the faithful performance by said company of the contract and to indemnify said city against all loss, damage or expense of any kind under it. Section 7 provides that before putting in the tunnel Marshall Field & Co. shall provide for the care and adjustment, under the direction of the commissioner of public works and to his satisfaction, of the sewers, water pipes, electric light conduits and other public utilities in that portion of Washington street covered by the ordinance, at the expense of said company. And section 8 provides that Marshall Field & Co. shall not prevent or delay any revocation of said ordinance by the mayor or city council by any action at law or in chancery.

The cause was heard by the chancellor on amended bill and answers. From the pleadings and proof introduced, it appears that the title to Washington street is in the city; that the sub-surface of the street at the point in question is now, and has been for years, used for public utilities, including sewers, water pipes, gas mains, gas pipes, electric light wires and conduits; that some 52,800 cubic feet of space are taken for said tunnels and they occupy under said street 4800 square feet of superficial area; that the tunnels, at the time of the hearing below, were practically com-

pleted at a cost of about $70,000 and were then being used
and occupied in accordance with the provisions of the ordi-
nance; that the upper tunnel, situated half way between
Wabash avenue and Holden court, was eighty feet in width
and nine feet and two inches in height, the bottom being
fifteen feet below the surface of the ground; that the lower
or sub-basement tunnel, located substantially under the east
half of Holden court if extended across Washington street,
was twenty feet in width and fourteen feet in depth, the
bottom being twenty-seven feet below the surface of the
street; that while said tunnels were being constructed, or
thereafter, the grantee at its own expense, under the direc-
tion of the city officials and working with the officials of
the various public utility companies affected, had changed
the gas mains, gas pipe, electric light wires, telephone wires,
conduits, etc., and placed them above the upper tunnel but
below the surface of the street. It further appears from
the record that under the supervision of the city authorities
Marshall Field & Co. had changed the six-inch water pipe
in the street, which theretofore was laid at grade about six
feet below the surface at this point, so that it ran down
one side of the upper tunnel and under and then up the
other side, so that the water would run through the bend
somewhat on the principle of a siphon. It further appears
that before these tunnels were constructed, Holden court
at this point, where it crossed Washington street, was the
summit of a sewer in that street, so that the sewage in the
sewer east of Holden court would run towards Wabash
avenue and the sewage in the sewer west of Holden court
would run west to State street; that the grade, however,
of the sewer at Holden court in either direction was very
slight; that in constructing the upper tunnel Marshall Field
& Co., under the supervision of the city, cut out the section
of the sewer from Holden court to the east side of said
upper tunnel and blocked or stopped the end of the sewer
west of Holden court and the end of that part of the sewer

remaining east of said upper tunnel, leaving that portion of the street between Holden court and the east side of the upper tunnel without any sewer. Holden court is an alley parallel with and about half way between Wabash avenue and State street.

The evidence shows, without apparent contradiction, that so far as the water service pipes, gas mains, electric lights, telephone or other public utilities are concerned, (except sewers and subways,) the present and probable future needs were not, and probably will not be, interfered with by the construction of the tunnels or passageways in question; that the adjoining buildings were, and could be in the future, amply served, without hindrance, by all of these public utilities. The evidence also seems to show, without contradiction, that the adjoining buildings, for the present, are fully served as to sewerage facilities or outlets. The evidence, however, is not all in accord as to whether any necessary changes that may have to be made in the sewer system because of the future growth and needs of the city sewers, so constructed as adequately to take care of the sanitary and storm sewage of the city, would not be interfered with by the existence of these two tunnels or passageways. The testimony offered by appellant on this question tends to show that a comprehensive sewer system sufficient for all future needs of the city might require a main sewer to run under the surface of Washington street at this point in order to give proper sewerage facilities for that section of the city, while the evidence on the part of appellees tends to show that in any proper plan for the construction of a sewer system adequate for the future needs of the city, the summit of any sewer running east and west in Washington street ought to be between State street and Wabash avenue,—probably at Holden court, the same as the present system,—and that therefore these tunnels would not seriously interfere with the construction of such sewer system. The evidence on behalf of appellant also tended

strongly to show that these tunnels, as now constructed, would prevent the construction in Washington street, between State and Wabash, of subways for street railway passenger traffic. No evidence was offered on behalf of appellees that denied or contradicted in any way the evidence of appellant on this question.

The information alleges that the tunnels or passageways were to be used solely for the private purposes of Marshall Field & Co. to connect the basements and sub-basements of its buildings and were of no benefit to the public, but were injurious to the unobstructed use by the city, acting for the public, in maintaining and operating the existing public utilities as well as in the future installation and maintenance of public utilities. The answers denied these allegations, and asserted that the tunnels or passageways afforded means of travel to the public without restriction or discrimination, and that under the ordinance they were not to be used for the sale of merchandise, inconsistent with the use thereof by any portion of the public that might desire to pass across Washington street below the surface of the street from north to south, or *vice versa.* Counsel for the appellant contend that under the averments of the answers the use of said passageways or tunnels by the public meant only such portion of the public as patronized or entered the store or premises of Marshall Field & Co. It is conceded that the only way of entering or leaving these tunnels to the north or south is through the buildings of Marshall Field & Co. The evidence introduced by the appellant tended to show that the upper tunnel was being used by pedestrians passing back and forth; that the lower tunnel was apparently being used for the transfer of merchandise, and through it people were passing carrying boxes, apparently employees of the store; that there were also pedestrians passing through this lower tunnel. While the evidence is not very clear on this point, we judge that the lower tunnel was used largely by the employees of Mar-

shall Field & Co. for transferring or carrying merchandise back and forth between two buildings,—one on the north and one on the south side of said Washington street,—and that the upper tunnel was being used by the patrons of the store, and that anyone who desired could use said tunnel by going into the store on one side of said street and passing through the tunnel to the other building. It is stipulated that at the time of the hearing access to the tunnels or passageways from the Field building on either side began at eight o'clock in the morning and closed at five-thirty in the afternoon, and that this had been the rule ever since the passageways were built. The record further shows that the tunnel of the Illinois Tunnel Company is constructed at this point in Washington street, thirty-five feet below the surface. The testimony of one of the appellant's witnesses was to the effect that this tunnel company's tunnel would not interfere with the building of passenger subways in Washington street, though he stated in his testimony that other engineers argued to the contrary.

The chief arguments of counsel for appellant all center around and are based upon the legal principle, long and firmly established in this State, that a city holds its streets in trust for the benefit of the public, and cannot authorize their use for the sole and exclusive benefit of private individuals or corporations, to the detriment of the superior rights of the public. The highways of a State, including the streets in a city, are under the primary and paramount control of the legislature. In the absence of constitutional restrictions there is no limit upon the power of the legislature as to the uses to which streets may be devoted. As the municipal powers are derived from the legislature, it follows that the authority of municipalities over streets, and the uses to which they may legitimately be put, depend, within constitutional limitations, entirely upon the charter powers of the municipality granted by the legislature. (3 Dillon on Mun. Corp.—5th ed.—secs. 1128, 1129,

1161.) No absolute or iron-clad rule can be laid down with reference to what encroachments or obstructions upon the streets can be permitted by the municipality. The question, by the great weight of authority, always comes back to the point, are these obstructions or encroachments unreasonable and against the public interests? (3 McQuillin on Mun. Corp. sec. 1334.) The courts, in applying the rules of law to questions of this nature, should not permit the streets to be used in such a manner as to prejudice the rights of abutting owners while at the same time fully safeguarding all the rights of the public therein. These public rights do not depend upon the methods of travel recognized at the time the streets were opened or such public uses as have been sanctioned by long continued custom and acquiescence. The use of the streets must be extended to meet the new needs of locomotion, both above and below the surface of the ground. The public uses to which a city street may be applied cannot be limited by arbitrary rules, but must be extended to meet public wants and necessities occasioned by the enlarged uses to which the abutting property is devoted. (3 Dillon on Mun. Corp.—5th ed.—sec. 1155; *Molway* v. *City of Chicago,* 239 Ill. 486.) The right of the public in the city streets necessarily includes every kind of travel and communication for the movement or transportation of persons or property which is reasonable and proper. The original owners of lands in the great cities of our country did not foresee the growth of population and business which has caused property owners in such cities to erect buildings twenty stories or more in height and to excavate under them basements, cellars and sub-cellars; nor was it anticipated that the surface of the streets would be insufficient for the use of the people, either in the transaction of business or in the pursuit of pleasure. "Our system, which leaves to the land owner the use of a street above or below or on the surface, so far as he can use it without interference with the rights of the public, is just

and right, but the public rights in these lands are plainly paramount, and they include, as they ought to include, the power to appropriate the streets above or below the surface, as well as upon it, in any way that is not unreasonable, in reference either to the acts of all who have occasion to travel or to the effect upon the property of abutters. The increase of requirements for the public within the streets of our large cities has probably equaled, if it has not surpassed, the increase of requirements for business along the streets." (*Sears* v. *Crocker,* 184 Mass. 586.) This court, in holding that the city of Chicago could contract for the building of street railways in subways, stated that it was not improbable that in that city, in order to have a complete system of such railways, it would become necessary not only to build them upon but above and below the surface of the streets. *Barsaloux* v. *City of Chicago,* 245 Ill. 598.

While these general rules have been followed by most courts, their application to special facts has not always been the same. "The right of an owner of land abutting on public highways has been a fruitful source of litigation in the courts of all the States, and the decisions have been conflicting and often in the same State irreconcilable in principle. The courts have modified or overruled their own decisions, and each State has in the end fixed and limited, by legislation or judicial decision, the rights of abutting owners in accordance with its own view of the law and public policy." (*Sauer* v. *New York,* 206 U. S. 536.) Hence the decisions in other States may have little weight in Illinois if they are in conflict with the rules laid down heretofore by this court, for the established rules of law in any jurisdiction on these questions should not be lightly disregarded within such jurisdiction.

This court has stated that cities, in controlling and improving streets, are charged with the unquestioned duty of preparing them for public use at such time and in such manner as the public necessities may require; that, holding

the streets in trust for the public, the city authorities can not convey or divert them to other uses by granting to corporations or individuals rights or easements in the streets which interfere with the duty of preparing them for public use or to meet the public necessities; that in administering the trust the city cannot voluntarily place it beyond its power to discharge its duties therein. (*City of Quincy* v. *Jones,* 76 Ill. 231; *Matthiessen, etc. Zinc Co.* v. *City of La-Salle,* 117 id. 411.) In enforcing this rule it has been held that the city cannot deprive the property owners upon the streets, under the conditions there stated, of a sidewalk for the distance of half a mile; (*Carter* v. *City of Chicago,* 57 Ill. 283;) that where the streets are properly dedicated under the statute, they will be considered as designed for the purpose of travel or passage in any mode that does not tend to destroy their usefulness, but the municipality can not divert them to other uses or purposes; (*City of Jacksonville* v. *Jacksonville Railway Co.* 67 Ill. 540;) that a city cannot vacate, under the circumstances there presented, a five-foot strip, eighty-five feet long, for the purpose of permitting it to be used by the abutting property owner as an areaway connected with the basement of his building; (*Smith* v. *McDowell,* 148 Ill. 51;) that a city cannot permit a private owner to build across an alley, at the second story of the building, a covered bridge or passageway, as that would deprive adjoining property owners of light and air, to which they are entitled; (*Field* v. *Barling,* 149 Ill. 556;) that a city cannot grant to a private property owner, under an ordinance, the right to build a permanent awning, projecting into the street, over one of its doorways; (*Hibbard & Co.* v. *City of Chicago,* 173 Ill. 91;) that a city cannot grant the right to lay railway tracks in a street without a petition of the property owners, as required by statute; (*McGann* v. *People,* 194 Ill. 526;) that the owner of abutting property cannot be authorized to elevate his sidewalk for his private convenience, in order to use it as

a platform for loading and unloading goods at his build- ·
ing. *Chicago Cold Storage Warehouse Co.* v. *People,* 224
Ill. 287.

This court has also held that the city authorities cannot
grant the use of the streets exclusively to railroads. (*Li-
gare* v. *City of Chicago,* 139 Ill. 46.) In a later decision,
however, the court held, as to the same question, that the
city was authorized to grant the authority to the railroad
company to occupy the street when proper provision had
been made by such company and the city for sufficient
ground for the street alongside of the former street occu-
pied by the railroad. (*Ligare* v. *Chicago, Madison and
Northern Railroad Co.* 166 Ill. 249.) It has also been held
that a municipality can grant to private individuals the
right to lay switch tracks in the street, with which to con-
nect with the main railroad track; that when so laid the
switch tracks, in legal contemplation, become a part of the
main track with which they are connected, and therefore
are public highways. (*People* v. *Blocki,* 203 Ill. 363, and
cited cases.) By the same line of reasoning this court has
also held that a municipality was authorized to use substan-
tially all of the street for the elevation of railroad tracks,
except at the street crossings. (*Weage* v. *Chicago and
Western Indiana Railroad Co.* 227 Ill. 421, and cases cited.)
Again, it has been held that a passageway from an elevated
station platform to an adjacent building was not an un-
lawful obstruction of the street, said passage being used,
without restriction, by the public as a means of access and
egress during the hours that the building was open. *Roths-
child & Co.* v. *City of Chicago,* 227 Ill. 205.

Cases more nearly similar in facts to the situation we
are asked to pass upon here, are those that have to do with
the regulation by the city of the use of a portion of the
street underneath the surface. A property owner cannot
claim the absolute right to take up his sidewalk and extend
his coal cellar under it, but this right may be granted by

the public authorities in such a manner as not to interfere with the rights of others or of the public. (*Nelson* v. *Godfrey,* 12 Ill. 20.) A city, under special legislative authority as well as its general power, may grant permits for the building of vaults under the streets and sidewalks and require such compensation for the privilege as it may deem reasonable and just, the general doctrine being, that municipalities, under the power of exclusive control of streets, may allow any use of them consistent with the public objects for which they may be held. (*Gregsten* v. *City of Chicago,* 145 Ill. 451.) This, however, can only be done when the paramount right of the public to the full, free and safe use of the street in all of its parts is not thereby infringed upon. (*West Chicago Masonic Ass'n* v. *Cohn,* 192 Ill. 210.) The municipal authorities also have the power, in connection with the widening of a river and the building of a new bridge, to acquire an easement consisting of the right to swing the bridge over ground owned by a private corporation, and to agree, in consideration of such easement, to excavate a vault under the street for the use of such corporation as a boiler room, rent free. *City of Chicago* v. *Norton Milling Co.* 196 Ill. 580.

This court has quite recently had before it for consideration the respective rights of abutting property owners, the city authorities and the public with reference to the use of the space under the surface of the streets, both when the fee was owned by the city and when it was owned by the abutting property owners. In those cases it was decided that the rights of the abutting owners as to the space in the street beneath the surface, when owning the fee in the street, were greater than when the fee was in the city; that when the abutting lot owner was the owner of the fee he had the right to make any reasonable use of the street which did not interfere with the free enjoyment of the public easement therein, whereas when the city owned the fee the abutting lot owner had no rights in it except as

granted by the municipality; that in any event, whether
the fee title was in the city or the abutting property owner,
the street under the surface of the ground could only be
used in such a manner as would safeguard the paramount
right of the public to the full and unobstructed use of the
street for the purpose for which it was dedicated; that
the city would not be estopped by any action of its own
from requiring the space occupied beneath the street to be
surrendered to the city whenever it became necessary for
the uses of the public. (*Ryerson* v. *City of Chicago,* 247
Ill. 185; *Tacoma Safety Deposit Co.* v. *City of Chicago,*
id. 192; *Sears* v. *City of Chicago,* id. 204; *Illinois Trust
and Savings Bank* v. *City of Chicago,* id. 264.) We have
also held that the right to a temporary obstruction of pub-
lic travel on the surface of a street for the purpose of load-
ing and unloading vehicles in front of business premises
is recognized, and is a necessary exception to the general
principle concerning the obstruction of a street or encroach-
ment thereon which interferes with the general travel and
transportation; that the owner of abutting premises may
make a reasonable use of the street to convey goods from
his premises, and for that purpose may place temporary
obstacles to travel, such as skids, across the sidewalk;
(*Chicago Flour Co.* v. *City of Chicago,* 243 Ill. 268; *Tol-
man & Co.* v. *City of Chicago,* 240 id. 268; 3 Dillon on
Mun. Corp.—5th ed.—secs. 1169, 1170;) that as to these
questions there is no distinction, in law, between a public
street and a public alley, the city having the same power
and jurisdiction over one as over the other. *Burton Co.* v.
*City of Chicago,* 236 Ill. 383.

Counsel for appellant insist that the municipal authori-
ties must treat the space within the street lines below the
surface of the ground the same as the space above the sur-
face is treated. In a recent work, in considering this sub-
ject, the author states that the encroachments or obstruc-
tions on a street may be classified as (1) permanent or

(2) temporary; that they may also be classified as to the method of treatment, under the law, as encroachments (1) on the surface of the street, (2) above the surface of the street and (3) under the surface of the street, and that the decisions are much more strict against encroachments on the surface of the street than against encroachments above or below the surface, upon the theory that the former are much more liable to interfere with the permanent use of the public for travel. (3 McQuillin on Mun. Corp. sec. 1337.) This court has never classified encroachments on the streets in just this way, although the decisions have often distinguished between temporary and permanent obstructions. It is obvious from the authorities already cited that the decisions of this court rule more strictly with reference to encroachments on the streets above the surface of the ground than to encroachments beneath the surface.

Keeping clearly in mind the exact question that was involved in each of the different cases, we do not think there is any serious conflict in any of them in this State bearing on this question. All of them, while recognizing the rights of abutting property owners in the street, have endeavored to safeguard the paramount rights of the public in any use of the street which was reasonable or proper at the time or could be fairly anticipated for the future. It is only within a comparatively recent time that the sub-surface of the streets has been used for any purpose by the public. Formerly the abutting property owners used only the sub-surface under the sidewalks for coal vaults or for storage purposes. The public first began to use the space under the streets for sewers and water and gas mains. In recent years the public has begun to use it for telegraph and telephone lines, though these latter are still often placed, under certain restrictions, on poles set in the ground. (*City of Springfield* v. *Postal Telegraph-Cable Co.* 253 Ill. 346.) This sub-surface of the streets recently has been taken for almost every sort of a public use. In addition to sewers,

water mains and public utilities generally, we find this space used for public lavatories, public cisterns and other kindred public conveniences. It would be difficult, if not impossible, to anticipate with any reasonable certainty the future uses, either above or below the surface of the street, which may be required in the interests of the public. Under the authorities cited, the conclusion must be reached that a municipality has the power to permit the owners of adjacent property to use the space beneath the surface of the street, even when the city owns the fee, in any manner not inconsistent with the public necessity for street purposes. A great number of decisions can be found in this and other States bearing on the question as to what are or are not uses not inconsistent with street purposes, many of these decisions being very close to the line.

Under our constitutional provisions as construed by this court, cities, within certain general limitations, have the authority to declare the general policy in regard to the control of streets. (*Palmer* v. *City of Danville*, 154 Ill. 156; *Venner* v. *Chicago City Railway Co.* 258 id. 523.) In the absence of a contrary showing, this court will presume that the municipal authorities, in passing on matters of this kind, have acted for the best interests of the city. (*People* v. *Cregier*, 138 Ill. 401; *City of Chicago* v. *Norton Milling Co. supra.*) In considering the authority of the city as to the sub-surface of streets this court has stated that "the power of the municipality in this regard in cases where it owns the fee in its streets is subject to no limitation except that its exercise shall be reasonable and in a manner to safeguard the paramount right of the public to the free and unobstructed use of the street for the purpose for which it was dedicated." (*Sears* v. *City of Chicago, supra,* on page 216.) This record shows, without contradiction, that the public rights in the use of the sub-surface of Washington street have not been interfered with by the construction and use of the passageways, for any practical public

266 – 40

purpose. If the needs of the public require a subway for passenger travel any time within the life of this ordinance and the municipality decides that a subway shall be located at this point in Washington street, the ordinance gives ample authority for the city to revoke all rights created thereunder. What has just been said with reference to the needs of a subway in the future can be said with equal reason with reference to any future needs for the disposition of the city's sewage. Furthermore, the argument of counsel for appellees is not without merit that these tunnels or passageways are not solely in the interests of a private corporation. The proof shows that the upper tunnel is being used by any pedestrians entering either of the two buildings at either end of such passageway. The natural meaning of the word "passageway" is, a way used for public passage. If this upper tunnel is used generally by the patrons of Marshall Field & Co. it will tend to relieve the congestion of foot passenger traffic on the surface of Washington street at that point, and even though it is only used by the employees of Marshall Field & Co., to that extent it will tend to relieve that congestion on the surface.

It would be somewhat difficult, on principle, to distinguish between the right of the city to permit temporary obstructions in the street for building purposes or loading or unloading goods, and the construction of this tunnel under the conditions named in the ordinance. The only question involved in permitting either is whether such use is reasonable and whether it would improperly trespass on the rights of the public to use the street. On the evidence in this record, how does the use of the upper tunnel or passageway under this ordinance differ from the use of the passageway from the elevated railroad to Rothschild's store? (*Rothschild & Co.* v. *City of Chicago, supra.*) In that case only one end of the passageway was on the property of the abutting land owner, while here both ends of the passageways are so situated. The fact that one end of the

passageway in the *Rothschild & Co. case* was on the elevated railroad did not give any greater rights to the public in the access to the passageway than is given on the evidence in this case. Even though the ordinance must be construed as being only in the interest of Marshall Field & Co., as long as the paramount interests of the public in the street are fully safeguarded by it the ordinance cannot be held void as against the public interests.

In every case, we think, relied on by counsel for appellant the encroachment upon the street was of a permanent nature and for a fixed time,—usually for a long term of years,—and not, as here, under conditions where the encroachment in the street could be removed at any time if the municipal authorities so desired. Under the authorities in this as well as other jurisdictions, if the sub-surface of the street is needed by the public for travel or other public uses, the mere fact that such public use will deprive abutters of the use of vaults and other similar underground structures in the street theretofore maintained, cannot stand in the way of the construction of sewers or subways. "Abutters are bound to withdraw from the occupation of streets above or below the surface whenever the public needs the occupied space for travel." *Sears* v. *Crocker, supra; Tacoma Safety Deposit Co.* v. *City of Chicago, supra; Fifty Associates* v. *City of Boston,* 88 N. E. Rep. (Mass.) 427.

Counsel for appellant also argue that the ordinance in question is in conflict with section 22 of article 4 of the constitution, as granting a special or exclusive privilege to Marshall Field & Co. If that be true, the conclusions reached in many of the decisions heretofore cited would be subject to the same criticism. This question, under a somewhat similar set of facts, has been considered by this court in *Chicago City Railway Co.* v. *People,* 73 Ill. 541, *Covington* v. *City of East St. Louis,* 78 id. 548, and *Chicago General Railway Co.* v. *City of Chicago,* 176 id. 253, and

the ordinances there under consideration have been held not to be in conflict with this constitutional provision.

The able and exhaustive briefs of counsel have greatly assisted us in giving the questions involved on this hearing the consideration that their importance demanded. We can reach no other conclusion under the decisions of the courts of this State,—and those decisions are in accord with the weight of authority in other jurisdictions,—than that this ordinance, on the facts presented in this record, is neither *ultra vires* nor in conflict with the constitution.

The decree of the circuit court will be affirmed.

*Decree affirmed.*