(No. 32332.—

THE PEOPLES GAS LIGHT AND COKE COMPANY, Appellant,
*vs.* THE CITY OF CHICAGO, Appellee.

*Opinion filed Nov. 20, 1952—Rehearing denied January 19, 1953.*

458

DAILY, DINES, ROSS & O'KEEFE, and SIDLEY, AUSTIN, BURGESS & SMITH, both of Chicago, (FRANCIS L. DAILY, GEORGE J. O'GRADY, JOSEPH H. MUELLER, KENNETH F. BURGESS, DOUGLAS F. SMITH, and RICHARD L. SELLE, of counsel,) for appellant.

JOHN J. MORTIMER, Corporation Counsel, of Chicago, (JOHN C. MELANIPHY, of counsel,) for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

Appellant, The Peoples Gas Light and Coke Company, a corporation, filed its complaint in the circuit court of Cook County on June 20, 1944, seeking to recover from appellee, the city of Chicago, damages, expenses and costs alleged to have been incurred by the company in connection with the protection, removal and relocation of its mains, structures and facilities made necessary by reason of the construction by the city of an initial system of subways, particularly those in State and Dearborn streets in the city. The complaint was amended several times. Finally, on September 12, 1951, the court entered its order allowing appellee's motion to dismiss, theretofore filed, to stand as the motion to dismiss the amended complaint as further amended, and sustained the motion. The appellant elected to stand on its complaint as amended and refused to plead further. The court entered its order dismissing

the complaint at appellant's costs. From this final order appellant has brought its appeal directly to this court upon certificate by the trial judge that the validity of a municipal ordinance is involved and that the public interest requires that the appeal be taken here.

The leading facts, as disclosed by the amended complaint and the exhibits attached thereto, for purpose of this appeal may be stated as follows: Appellant is an Illinois corporation engaged in the business of producing, purchasing, distributing and selling gas for light and fuel purposes to the general public in the city of Chicago. It operates under a franchise given by ordinance of the city council passed on August 30, 1858. It is the only company now engaged in such business in the city of Chicago. Pursuant to its franchise, and with the consent of the city council from time to time, the company has constructed, operated and maintained public utility structures and appliances in and along the streets and alleys of the city for over ninety years. The company is a public utility subject to the jurisdiction of the Illinois Commerce Commission. As such utility it is obligated to maintain its structures and facilities in such condition as to enable it to render continuous service. The first section of the original franchise ordinance provides that permission and authority is given the company to lay its mains and pipes in the streets, alleys, public parks and squares of the city "subject at all times, however, to the resolutions and ordinances of the Common Council of said City."

On November 3, 1938, the city, acting under the authority of the Subways and Tunnels Act (Laws of 1929, p. 268,) afterward incorporated in the Revised Cities and Villages Act, (Ill. Rev. Stat. 1951, chap. 24, pars. 70-1 *et seq.,*) passed an ordinance for the construction of the subways in question. This ordinance recites that the "Initial System of Subways" to be built is intended to form an integral and convenient part of the local transportation

system of the city; that the term "subway" as therein used includes "tunnels, entrances, exits, passageways, connections, approaches, inclines, elevators, stations and other structures appropriate to a system of subways for local transportation purposes." It is provided that the subways shall be and remain the property of the city; that the initial system shall consist of tunnels or ways constructed in the city beneath the surface of streets, alleys, public places and other lands. The routes of the Dearborn and State streets subways are then particularly described and designated. Section 8 of the same ordinance provides that all persons owning or operating public utility structures and appliances in the streets, alleys or public places of the city in which the subways are to be constructed shall remove them and relocate them in such places in the streets, alleys and public places as the city council might thereafter designate. The ordinance contains no provisions for reimbursing a public utility for any expense incurred in the removal or relocation of its facilities.

The city began construction of the subways on or about December 15, 1938. As the work progressed the city requested the company from time to time to protect, remove and relocate certain of its mains and structures. This was done by the company at a total cost in excess of $1,000,000. It was agreed both orally and in writing that expenses incurred by the company would be without prejudice to its right to claim reimbursement from the city and that the city, in requesting the changes, was doing so without prejudice to its right to deny that it was obligated.

On December 21, 1939, the city passed an ordinance creating an executive department of the city, to be known as the Department of Subways and Superhighways, headed by a commissioner. The commissioner, among other things, was empowered to prepare plans and specifications, to supervise and control construction and maintenance and secure rights of way for subways for local transportation

purposes constructed by the city under authority of the Subways and Tunnels Act. On May 29, 1941, an additional ordinance was passed authorizing the commissioner to acquire, construct and install certain transportation equipment in the subways and on inclined structures connecting it with the elevated railroad structures of the Rapid Transit System. The complaint alleges that the subway was constructed and designed to permit the operation therein of electrically propelled passenger cars on standard gauge tracks; that the subway as constructed is not adaptable or available to the public for general highway purposes but is by design suited exclusively for the commercial operation of electric trains as part of the local Rapid Transit System.

The construction of the subway was financed in part by a grant from the Federal government. The remainder of the cost was borne by the city out of the city's traction fund, which was an accumulation of franchise money paid by the Chicago Surface Lines and was expendable only for construction and improvement of local transportation facilities. Part of this fund was used by the city to protect, remove and relocate city-owned water mains, sewers and electric conduits incident to subway construction.

The city has never owned or operated any trains or other transportation facilities in the subway. By ordinance of August 5, 1942, the city authorized the temporary use of the subway by the trustees in bankruptcy of the Chicago Rapid Transit Company and Union Consolidated Elevated Railway Company. By the ordinance the trustees were to provide the cars or trains of cars and operate and maintain them. Route One of the system (State Street) was delivered to the trustees on October 16, 1943, and used by them for the operation of trains until October 1, 1947.

By act of the Illinois legislature approved April 12, 1945, the Chicago Transit Authority was created with power to acquire and operate the several properties then

furnishing local transportation service in the city and contiguous territory. The city, on April 23, 1945, passed an ordinance granting to the Transit Authority the exclusive right, for a period of fifty years, to use the subway, the streets and other public places to operate facilities for local transportation. On or about October 1, 1947, the Transit Authority took possession and began the operation of the properties furnishing local transportation service. At the same time possession of the State Street subway, known as Route One, was delivered by the city to the Authority. Upon its completion in 1951, the Dearborn subway, known as Route Two, was also delivered. The Transit Authority now uses the subway system in which to operate trains as an integral part of its system. The subway is available for use only by the fare paying passengers. The Authority pays the city a percentage of its gross receipts as compensation for the use of the subway and the streets, alleys and other public places within the city in which it operates its trains.

Appellant's complaint contains two counts. By count I the alleged liability of the city is predicated upon the existence of a common-law duty as well as a cause of action under the constitutions of the State of Illinois and of the United States. Count II seeks recovery under the provisions of the Subways and Tunnels Act, particularly, section 7 of that statute. Since the complaint was stricken in its entirety, the question before us is whether the complaint, in either count, states a cause of action.

Appellant's theory under count I is bottomed on the proposition that in constructing the subways the city was acting in its proprietary capacity; that the city is subject under the common law to the same liability for the dislocation of the company's structures as any private individual or company engaged in the same activity; that by seeking to compel the company to remove and relocate its structures without compensation the city is violating the

company's constitutional property rights. Appellant also contends that, by the passage of an ordinance to compel the company to make the changes at its own expense, contract rights of the company as protected by both the State and the Federal constitutions are impaired. The city contends that in constructing the subways it was acting in its governmental capacity; that since it acted in that capacity the immunity of the sovereign attaches to its acts and no liability exists either at common law or under the constitutions. Counsel for the city say that the subways were merely an extension of the streets and highways of the city at lower levels. Both parties concede that the answer to the question whether the city was acting in its governmental or proprietary capacity is decisive of the issues under count I of the complaint.

Appellant admits that the construction and maintenance of streets by a municipality in the sense of ways open to the general public for ordinary travel on foot and in their own vehicles is a governmental function as distinguished from a proprietary activity, but contends that in constructing a subway below the street surface adaptable for the installation of tracks and equipment for the operation of electric railroad cars, the city embarked on a purely proprietary venture. The city takes the position that the subways in question are merely additional highways at lower levels built by the city to further the public health, safety, morals and convenience; that they have been built in the interest of the entire public and were, therefore, built by the city as an agency of the sovereign State in furtherance of its proper governmental functions.

This court has long recognized the principle that, so far as the streets of a municipality are concerned, the public has a real interest in their proper construction, maintenance and use, and by "public" we mean not only the citizens of the city itself but the entire public of which the sovereign State, through the arm of the legislature, is

the representative. So far as its streets are concerned, a city is only an agency of the State, and whether it has the fee or only an easement in the streets it holds them in trust for the people of the entire State. So far as their use for street purposes is concerned, every citizen of the State has an equal right. (*City of Alton* v. *Illinois Transportation Co.* 12 Ill. 38; *County of McLean* v. *City of Bloomington,* 106 Ill. 209; *Sears* v. *City of Chicago,* 247 Ill. 204; *Chicago Railways Co.* v. *City of Chicago,* 292 Ill. 190.) This right of the people in the streets and highways of the State, whether inside or outside the municipalities thereof, is a paramount right. The municipality cannot lawfully perform any acts itself nor permit others to do or perform anything in derogation of this right of the sovereign people, nor may the city permit any uses or encroachments which are unreasonable and against the public interest. *Chicago, Burlington and Quincy Railroad Co.* v. *City of Quincy,* 136 Ill. 563; *People ex rel. Mather* v. *Marshall Field & Co.* 266 Ill. 609.

The foregoing principles apply as well to public utilities and service companies authorized by franchise to exercise certain rights of easement in the public streets as to any other individual or corporation. A city cannot lawfully grant to a utility any rights or privileges which are inconsistent with the public necessities in the way for street purposes. (*People ex rel. City of Chicago* v. *Chicago City Railway Co.* 324 Ill. 618.) In the case just cited this court held that a street railway company which had laid its tracks on a certain street in the city of Chicago could be compelled to move its tracks at its own expense to the center of the street as widened by the city. In considering the rights of the company in relation to the rights of the public in that case we said, at page 621: "The permission given a railway company to use the streets of a city is in subordination to the general power of the municipality over its streets. The city is under no obligation to con-

form its treatment of its streets to the construction of the company's road-bed, but, on the contrary, the company must conform the construction of its road-bed to such reasonable regulations as are made by the municipality in the reasonable exercise of its powers concerning the use, control, regulation and improvement of its streets. Street railways occupy public streets subject to the use of such streets by the public, subject to such burdens as may be made necessary by reason of the improvement of such streets and subject to such changes in the construction of road-beds as improved and changed conditions may demand." In the same case, in considering the company's contention that it could not be compelled to move its tracks without adequate compensation, it was said, at page 623: "If a street railway company which has been given license to occupy the streets of a municipality may not be compelled to relocate its tracks when conditions change and public convenience requires, it might forever prevent improvements and developments in a particular section and would thereby determine its growth. If the city could not change the grade or the width of its streets except upon condition that it make compensation to the railway company, the gas company, the water company, the telephone company, the electric light company, and other companies occupying the streets under a contract with the city, for inconvenience and expense thereby occasioned, the duty of the city to protect the public in its use of the streets from time to time, as the community develops, to keep the streets in such condition as will accommodate public safety and convenience, would be seriously interfered with. All corporations thus occupying the streets take their grants from the city upon the condition that the city has reserved to it the full and unconditional power to make any reasonable change of grade or other improvements in its streets as the public necessity and convenience demand. *Columbus Gas Light and Coke Co.* v. *City of Columbus,*

50 Ohio St. 65, 19 L.R.A. 510; *Anderson* v. *Fuller,* 51 Fla. 380, 6 L.R.A. (n.s.) 1026." It should be emphasized here that the principles announced in the case last cited apply with equal force to all companies occupying the streets or portions thereof under franchise, whatever the nature of the utility and regardless of any franchise provision which might appear to give vested rights in conflict with the public interest. Any such franchise provision would be void, as stated in the same opinion at page 622: "The ordinance of 1907 which authorizes the railway company to construct, maintain and operate its system of street railways in the streets of the city of Chicago provides that 'the exact location of tracks in the streets shall be subject to the approval of the commissioner of public works.' The tracks in question were located in Twenty-second street with the approval of the commissioner, and appellee seems to contend that the city is thereby estopped to require it to relocate its tracks at its own expense. This provision in the ordinance did not change the relation of the parties. Without the provision the city had the right to direct the location of the tracks in the streets so as to protect the public in its use of the streets. The ordinance specifically provides that nothing contained in it shall be construed to deprive the city of its right to exercise the police power which it had at the time the ordinance was passed, but this provision was merely declaratory of the law as it already existed. There is nothing in the ordinance to indicate that the city has surrendered any of its power and authority to control and improve its streets, and if there were it would be void. The power of the city to protect the public in the use of its streets cannot be abrogated by ordinance or relinquished by contract. *New Orleans Gas Light Co.* v. *Drainage Com.* 197 U.S. 453, 25 Sup. Ct. 471; *Snouffer* v. *Cedar Rapids and Marion City Railway Co.* 118 Iowa, 287, 92 N.W. 79; *Macon Consolidated Street Railroad Co.* v. *City of Macon,* 112 Ga. 782, 38 S.E. 60."

The principles and cases thus far discussed involve primarily the relative rights of the public and companies including utilities in the streets when used for surface travel. This court has indicated that the same rules apply when the relative rights in the subsurface are in question. In its opinion in *People ex rel. Mather* v. *Marshall Field & Co.* 266 Ill. 609, this court, in discussing the enlarged needs of the public in cities for travel and transportation, said, at page 618: "The courts, in applying the rules of law to questions of this nature, should not permit the streets to be used in such a manner as to prejudice the rights of abutting owners while at the same time fully safeguarding all the rights of the public therein. These public rights do not depend upon the methods of travel recognized at the time the streets were opened or such public uses as have been sanctioned by long continued custom and acquiescence. The use of the streets must be extended to meet the new needs of locomotion, both above and below the surface of the ground. The public uses to which a city street may be applied cannot be limited by arbitrary rules, but must be extended to meet public wants and necessities occasioned by the enlarged uses to which the abutting property is devoted." In the same opinion, at page 627, it was stated: "Under the authorities in this as well as other jurisdictions, if the sub-surface of the street is needed by the public for travel or other public uses, the mere fact that such public use will deprive abutters of the use of vaults and other similar underground structures in the street theretofore maintained, cannot stand in the way of the construction of sewers or subways."

In a case decided by the Supreme Judicial Court of Massachusetts in 1904, it was held that the construction and operation of a subway beneath the surface of a public street in Boston by the Boston Transit Commission as authorized by the legislature, which had determined that the space below the surface of the street was needed for

travel by the public, was a reasonable use of the street and did not impose an additional servitude upon the lands constituting the street, the fee of which was in the owners of abutting properties, and that, accordingly, the subsurface of the street could be so utilized for subway purposes by the public authority without first resorting to a formal taking of the land for that purpose. The court there observed that while in former days it was never thought that the surface of the street would be insufficient for the use of the people, it was now a fact of common knowledge that the streets of the most crowded parts of Boston were entirely inadequate to accommodate the public travel in a reasonably satisfactory way if the surface alone were used. The court said: "Our system, which leaves to the land owner the use of a street above or below or on the surface, so far as he can use it without interference with the rights of the public, is just and right, but the public rights in these lands are plainly paramount, and they include, as they ought to include, the power to appropriate the streets above or below the surface, as well as upon it, in any way that is not unreasonable, in reference either to the acts of all who have occasion to travel or to the effect upon the property of abutters. The increase of requirements for the public within the streets of our large cities has probably equaled, if it has not surpassed, the increase of requirements for business along the streets." (*Sears* v. *Crocker*, 184 Mass. 586.) Just four years after the decision in *Sears* v. *Crocker*, this court had before it the case of *Barsaloux* v. *City of Chicago*, 245 Ill. 598. We held that under an act of our legislature passed in 1903, known as the Mueller Law, empowering cities to use, construct, acquire, purchase, maintain, operate and lease street railways within their corporate limits, a city was empowered to construct such railways not only on the surface of the streets but above and below the surface as well. In that opinion we observed, at page 607: "If the public interest

should require that all or a portion of the street railways of a city should be constructed beneath the surface of the streets, no valid reason is perceived why the power to meet such public necessity should be denied in respect to such subways that does not apply with equal force to surface and elevated street railways. Street railways, whether constructed above, below or on the surface of the streets, are intended to furnish the public with a convenient means of traveling from one part of a city to another. The primary use of streets is to accommodate travel in cities and towns, and since street railways' afford the public increased facilities for street travel, the use of streets for this mode of travel does not impose any additional servitude on such highways."

From the principles heretofore discussed we conclude that providing ways for travel below the surface of the streets of a municipality is a proper street use and that the same rules and principles as to the relative rights of interested parties apply to the ways below the surface as to those upon the surface. The rights of the public remain paramount, and other owners, including utilities, occupying such subsurface space do so subject to those rights.

Appellant contends, however, that the subway in question here is more than an additional highway or street at a lower level; that since it was designed at the outset for the installation of tracks on which electric trains should be operated on a commercial basis the whole scheme amounts to a proprietary activity on the part of the city to which none of the incidents of sovereignty attach. Appellant relies principally upon a line of decisions by the courts of the State of New York, where it has been held that a rapid transit subway railroad is not a normal street use but rather an extraordinary use of the street which constitutes an additional burden or servitude, and that the city, in constructing and operating the subway, under the provisions of the Rapid Transit Act of the State of New York,

is acting in its proprietary capacity and not its governmental capacity. (*In re Board of Rapid Transit Railroad Commissioners of New York*, 197 N.Y. 81; *City of New York* v. *New York Telephone Company*, 278 N.Y. 9; *New York & Queens Electric Light & Power Co.* v. *City of New York*, 221 App. Div. 544, 224 N.Y.S. 564.) We have examined these and other decisions of the courts of New York with considerable care. It should be observed that these involve not only the construction of subways but the operation of trains as well. It appears, however, that in principle they differ from the earlier decisions of this court. It has been observed that in the leading New York case (first above cited) it was not necessary to the decision that the court announce that the activity of the city in connection with the rapid transit subway was proprietary. The action involved the rights of abutting property owners to compensation and the pronouncement as to functional distinctions was superfluous. (See the specially concurring opinion in the case and the annotation: Street or Highway, Use of Subsurface, 11 American Law Reports, 2d, 180.) The cases as collected and analyzed in the annotation just referred to show that the New York rule is contrary to the decisions of the courts of Massachusetts, New Jersey, Ohio and Pennsylvania, and that while there are no decisions in Illinois upon the specific question whether a rapid transit subway is a proper street use, decisions of this court, including that in the *Barsaloux case,* indicate that this jurisdiction favors the view taken by the majority. Historically it is interesting to note that the New York courts have from early times held that the laying of railroad tracks in a public street constitutes an additional burden or servitude for which the adjoining owners are entitled to compensation, while the contrary has always been held by the courts of Massachusetts and of this State. *Chicago, Burlington and Quincy Railroad Co.* v. *West Chicago Street Railroad Co.* 156 Ill. 255.

We believe the better view to be that a subway system merely amounts to an addition to the streets which increases the capacity to serve the needs of the public as a manner of travel and transportation; that a subway is a normal and proper street use and that these principles are applicable to all subways constructed by a city for public travel, whether or not designed for the installation and operation of tracks and trains of cars. It must also be remembered that the legislature, in granting authority to cities to build subways and operate trains therein, has recognized a distinction between the subways themselves and railroad operation. Thus, in section 1 of the Subways and Tunnels Act, cities are empowered to construct and acquire subways which are defined as "tunnels, entrances, exits, passageways, connections, approaches, inclines, elevators, stations, and other structures, equipment, appliances or appurtenant property, appropriate to a system of such subways." (Ill. Rev. Stat. 1951, chap. 24, par. 70-1.) By this statute cities are authorized to construct and acquire such subways without referendum. Section 5 of the same act deals with the construction of tracks and the operation of railways in subways. A city may construct tracks and operate the same for transportation purposes but it may lease or grant the same for railway operation by others only upon referendum. (Ill. Rev. Stat. 1951, chap. 24, pars. 70-5 and 70-6.) Such damages as appellant suffered were occasioned in connection with the building of the subway and not in connection with the operation of trains. The city has at no time operated trains in the subways. Such operations were first undertaken by the trustees of the defunct transportation companies and later by the Chicago Transit Authority after its creation by the legislature.

In the case of *People* v. *Chicago Transit Authority,* 392 Ill. 77, this court held that the act creating the Authority was constitutional; that the operation of the street railways by the Authority was a public function which

could be authorized by the legislature in the exercise of its police power because of the vital relation to the public convenience, health and welfare. In that decision it was emphasized that the General Assembly had a large measure of discretion in determining what are public purposes. This court decided that the city might grant the use of its city-owned subways to the Authority as well as the exclusive right to operate in the streets. We believe that counsel for the city are correct in saying that the conclusion that the city was acting in its governmental capacity when it constructed the subways is the only conclusion that can be harmonized with the enactment of the Municipal Transportation Authority Act, the operation of that act and the decision of this court sustaining its constitutionality.

Count I of the complaint alleges not only a common-law basis of liability but a constitutional basis as well. The acts of the city are alleged to be in contravention of appellant's property and contract rights guaranteed both by the constitution of this State and the constitution of the United States. It is also contended that appellant has been denied equal protection of the laws. In this same connection the argument is advanced that section 8 of the ordinance passed by the city council of the city of Chicago on November 3, 1938, is unconstitutional because it requires the appellant to remove and relocate its structures without any provision for compensation, which is violative of the company's property rights and also its contract rights under its franchise ordinance. Counsel for appellant concede that the assertion of common-law and constitutional liability are alike predicated upon the proposition that the city was acting in its proprietary capacity in constructing the subway. Once we have concluded, therefore, that the city was acting in a governmental capacity, the constitutional arguments lose force. However, since the Supreme Court of the United States has dealt with the question of the constitutional rights of a utility company under circumstances similar to

those now before us we deem it advisable to call attention to that decision. In *New Orleans Gas Light Co.* v. *Drainage Commission of New Orleans,* 197 U.S. 453, the Supreme Court of the United States decided that compelling a gas company to change its facilities at its own expense in connection with subsurface construction of a drainage system by the city of New Orleans did not impair any contract rights of the company under its franchise nor constitute a taking of its property without just compensation. The Supreme Court, observing that there had been no more interference with the property of the gas company than had been necessary to carry out the drainage plan and no showing that the value of the property had been depreciated nor that the company had suffered any deprivation further than the expense which was rendered necessary by the changing of the location of the pipes to accommodate the work of the commission, said: "This right of control seems to be conceded by the learned counsel for the plaintiff in error, insofar as it relates to the right to regulate the use of the surface of the streets, and it is recognized that the users of such surface may be required to adapt themselves to regulations made in the exercise of the police power. We see no reason why the same principle should not apply to the subsurface of the streets, which, no less than the surface, is primarily under public control. The need of occupation of the soil beneath the streets in cities is constantly increasing, for the supply of water and light and the construction of systems of sewerage and drainage, and every reason of public policy requires that grants of rights in such subsurface shall be held subject to such reasonable regulation as the public health and safety may require. There is nothing in the grant to the gas company, even if it could legally be done, undertaking to limit the right of the State to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject, insofar as

the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare. These views are amply sustained by the authorities." See, in accord, *Philadelphia Electric Co.* v. *Philadelphia,* 301 Pa. 291, app. dismd. 283 U.S. 786.

We are impelled to the same conclusion in the case now before us. Under its franchise ordinance appellant was, in the maintenance of its structures, subject at all times to the resolutions and ordinances of the common council of the city of Chicago. It had no vested right to have its facilities remain where they were. In connection with the construction of the subway, appellant was required to, and did, relocate its mains and fixtures. No complaint is made that the city failed to provide other suitable locations for those facilities or that property of appellant was taken or its value depreciated. 'The only injury suffered by appellant in connection with the construction was the cost of removal and relocation, and that, in the words of the Supreme Court of the United States, is *"damnum absque injuria."* We conclude that no constitutional right of appellant has been infringed or impaired and that the ordinance in question was not unconstitutional for the reasons assigned.

The final contention is that appellee is liable under the provisions of section 7 of the Subways and Tunnels Act. (Ill. Rev. Stat. 1951, chap. 24, par. 70-7.) This alleged cause of action is set up in count II of appellant's complaint. The statute provides that in connection with the construction of subways a city may require public utility companies owning structures in the streets to remove and relocate them in such places in the subways or elsewhere as the city may designate and, in default of their removal by the companies, to do so itself. The section further provides that such removal by the city or by others shall be done only upon such terms and conditions as the municipality and these persons may agree upon or, in default of

such agreement, upon such fair and reasonable terms and conditions as the municipality may prescribe. The section then continues: "These terms and conditions may include fair and reasonable provisions as to how much, if any, of the expense of the removal, or relocation, shall be paid by the owners or operators of public utility structures and appliances, respectively, and as to what compensation, if any, shall be paid to the municipality by the owners or operators of public utility structures and appliances, respectively, for the use or occupation of such space, if any, as they may use or occupy in the subways." An examination of the statute indicates certainly that there is no specific provision in it that the city shall bear the entire cost of removal or relocation. The most that could be said for appellant's view is that it might be argued that the statute contemplates that the city bear a portion of the expense. We do not find, however, that the statute so provides. That portion of the section that says the power shall be exercised only on such terms and conditions as may be agreed upon or on such fair and reasonable terms as the municipality may prescribe clearly relates only to the actual removal and relocation of the fixtures and would include such matters as the specification of time for removal, the space to be occupied, whether in the subway itself or elsewhere, and the manner of removal so far as other structures, municipal or private, might be affected or concerned. The concluding portion of the section says nothing about the payment of any portion of the cost by the city. It concerns payment of the cost of removal and relocation by the owners of the structures and possible payment to the city for right to occupy space in the subways themselves. It relates to possible apportionment of cost of removal among the utilities themselves, otherwise the word "respectively," used twice in the last sentence, has no meaning. Nothing in the statute says that the expense should be borne by the utilities and the municipality. We

believe that if the legislature had intended to charge a portion of the cost to the municipality it would have provided clearly, as it did in the Public Utilities Act, (Ill. Rev. Stat. 1951, chap. 111⅔, par. 62,) for the apportionment of part of the cost to the governmental unit. Our conclusion is that count II of appellant's complaint states no cause of action against appellee and that it was properly stricken upon motion.

The judgment of the circuit court of Cook County dismissing appellant's complaint and entering judgment in favor of appellee was correct, and it is affirmed.

*Judgment affirmed.*

Mr. JUSTICE DAILY took no part in the consideration or decision of this case.