# Illinois Official Reports

## Appellate Court

---

**Independent Voters of Illinois Independent Precinct Organization v. Ahmad,**
**2014 IL App (1st) 123629**

---

| | |
|---|---|
| Appellate Court Caption | INDEPENDENT VOTERS OF ILLINOIS INDEPENDENT PRECINCT ORGANIZATION, and AVIVA PATT, Plaintiffs-Appellants, v. AMER AHMAD, Comptroller of the City of Chicago, and CHICAGO PARKING METERS, LLC, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-3629 |
| Filed | June 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The validity of the concession agreement by which the City of Chicago transferred to defendant its metered parking system and all revenue produced from the parking meters for 75 years in exchange for $1.1 billion was upheld over plaintiffs' various challenges, including their claims that the agreement violated the public purpose and home rule provisions of the Illinois Constitution. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-28993; the Hon. Richard J. Billik, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Krislov & Associates, Ltd. (Clinton A. Krislov and John Orellana, of counsel), and Depres Schwartz & Geoghegan, Ltd. (Thomas H. Geoghegan and Mike Persoon, of counsel), both of Chicago, for appellants.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Julian N. Henriques, Jr., Assistant Corporation Counsel, of counsel), for appellee Amer Ahmad.

Winston & Strawn, LLP, of Chicago (Robert Y. Sperling, Bryna J. Dahlin, and Christopher J. Letkewicz, of counsel), and Winston & Strawn, LLP, of Washington, D.C. (Elizabeth P. Papez, *pro hac vice*, for appellee Chicago Parking Meters, LLC.

Panel

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     This is a taxpayer challenge to the City of Chicago's (the City) concession agreement with Chicago Parking Meters, LLC (CPM), pursuant to which the City transferred to CPM its metered parking system and all revenue produced from the parking meters for 75 years, in exchange for a one-time payment of $1,156,500,000. The circuit court dismissed certain of plaintiffs' claims pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)) and later granted summary judgment in favor of defendants on the remainder of plaintiffs' claims pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2012)). Plaintiffs appeal from the dismissal and summary judgment orders. CPM filed a conditional cross-appeal from one of the circuit court's findings regarding plaintiffs' standing to file their complaint, asking that we review this ruling in the event we reverse the decision of the circuit court based on plaintiffs' appeal. Because we affirm, we will not address CPM's conditional cross-appeal.

¶ 2                    I. Background Facts Regarding the Concession Agreement

¶ 3     In 2008, the City announced that it sought to enter into a contract pursuant to which a private entity would take over from it the obligation and expense of operating the metered parking system in Chicago, and would be granted the right to keep the fees paid at the parking meters. The announcement invited interested parties to supply information showing

their qualifications to be the concessionaire who would operate the metered parking system. The City determined that certain of the responding entities, including CPM, were qualified, and provided a form for each to submit a binding offer specifying the amount it would pay the City for the concession "based upon the final form of the concession agreement." CPM submitted the highest bid of over $1.15 billion and the City declared it the winning bidder.

¶ 4 An ordinance authorizing City officials to execute the concession agreement with CPM was required in order for CPM to operate and maintain the metered parking system. On December 4, 2008, the city council enacted that ordinance (the Metered Parking System Ordinance) by a vote of 40 to 5 to approve the concession agreement with CPM. The Metered Parking System Ordinance (Chicago City Council, Journal of Council Proceedings, Dec. 4, 2008, at 50508), found that the concession agreement "is in the best interests of the residents of the City and desirable for the welfare of its government and affairs" and further provided that "[t]he City shall appropriate amounts sufficient to pay when due any amounts payable by the City under the concession agreement." *Id*. at 50509.

¶ 5 Before executing the concession agreement, the City asked its outside counsel, Katten Muchin Rosenman LLP (Katten), to provide a legal opinion addressing whether the city council had the authority to enact the Metered Parking System Ordinance, which would authorize City officials to execute the concession agreement. On February 13, 2009, Katten issued the requested opinion, which concluded:

> "1. The City is a municipality and home rule unit of local government, duly organized and existing under the Constitution and laws of the State of Illinois.
>
> 2. The city council of the City has (i) duly adopted the Metered Parking System Ordinance, which remains in full force and effect, (ii) duly authorized and approved the execution and delivery of the Agreement and other documents related to the transactions contemplated by the Agreement and (iii) duly authorized and approved the performance by the City of its obligations contained in the Agreement. The City has the power and authority to adopt the Metered Parking System Ordinance, to enter into the Agreement and do all acts and things and execute and deliver all other documents as are required under the Agreement to be done, observed or performed by the City in accordance with the terms thereof."

¶ 6 The concession agreement closed on February 13, 2009, and CPM promptly paid the concession fee of $1,156,500,000 to the City in return for the City's transfer of control of the approximately 36,000 on-street parking meters to CPM for a 75-year period. CPM agreed to operate, maintain and improve the parking meter system. CPM proceeded with upgrading the parking meter system by installing "Pay and Display" pay boxes that permit payment by credit or debit card, allow more cars to park on the street, and allow customers to purchase "portable time" (*i.e.*, the right to park in multiple meter locations without paying duplicative meter fees). The concession agreement transferred to CPM the right to keep the parking fees at those devices for the 75-year term.

¶ 7 After receiving the $1,156,500,000 from CPM, the City used that money to set up: (1) a $400 million revenue replacement fund to generate $20 million a year in expected annual interest that could be used for the City's ongoing operations; (2) a $100 million human infrastructure fund to support a variety of programs aimed at providing resources to the City's businesses, homeowners and residents most in need; (3) a $325 million mid-term reserve fund to supplement revenues in the City's corporate fund through 2012; and (4) a

$324 million budget stabilization fund to pay any amounts the City might owe CPM under the concession agreement and for any other purposes authorized by the city council.

¶ 8    Pursuant to section 3.1(a) of the concession agreement, the City retained its home rule authority over the parking meter system, which was defined to include "the exercise by the City of those police and regulatory powers" relevant to "Metered Parking Spaces" and the "regulation of traffic, traffic control and the use of the public way," including: the power to decide when and where to add and remove metered parking spaces; the periods of operation of, and the limits of stays in, such parking spaces; the amounts of fees paid at parking meters; and the amounts of fines for metered parking violations. See concession agreement § 1.1 (definition of the City's "Reserved Powers").

¶ 9    Under section 7.6(a) of the concession agreement, the City must "adopt and enforce rules and regulations with respect to the Metered Parking Spaces," and "[t]he City agrees to establish, maintain and undertake procedures for the enforcement of parking rules and regulations that are designed to deter parking violations." Section 7.6(a) explains that CPM is not entitled to collect or share in "punishments" (*i.e.*, monetary fines) imposed in "the adjudication of parking violations." Instead, any fines or proceeds generated from parking meter violations go exclusively to the City. The City's annual appropriations ordinance for year 2010 estimated that the City would receive almost $263 million in revenue that year from "fines, forfeitures, and penalties" while spending less than $9.8 million to pay the salaries of personnel who perform "Parking Enforcement" and "Boot and Tow" functions.

¶ 10   The concession agreement contains multiple provisions requiring the City to pay compensation to CPM (concession compensation) for certain "Compensation Events," *i.e.*, the City must make payments to CPM for the exercise of any police powers that reduce metered parking revenue. These compensation payment provisions are based on the premise that the approximately $1.15 billion CPM paid the City for the concession represents the estimated 75-year value of an assumed number of parking meters assets, whose value may change as a result of the City's exercise of its home rule powers over meter inventory or operations. Accordingly, the City agreed to compensate CPM as necessary so as to allow CPM to maintain the benefit of the bargain.

¶ 11   The concession agreement specifically enumerates the compensation events triggering payment by the City of concession compensation to CPM. Such compensation events include the following:

(1) The City's changing of the operating standards, defined as the "standards, specifications, policies, procedures and processes that apply to the operation of, maintenance of, rehabilitation of and capital improvements to, the Metered Parking System" (see concession agreement §§ 1.1, 6.3(a), (b));

(2) The addition of any "Competing Public Parking Facility," defined as:

"[A]ny off-street public parking lot or public parking garage that (i) is (A) owned or operated by the City or (B) operated by any Person and located on land owned by the City, or leased to the City, (ii) is within one mile of a Concession Metered Parking Space, (iii) is used primarily for general public parking; (iv) has a schedule of fees for parking motor vehicles that is less than three times the highest Metered Parking Fees then in effect for Concession Metered Parking Spaces in the same area; and (v) was not used for general public parking on the effective date of this Agreement" (see concession agreement §§ 3.12(a), (c));

(3) The City's (i) lowering the fine and penalty charges on unpaid parking tickets to less than 10 times the hourly meter parking rates, and (ii) raising the number of tickets a vehicle may be issued before requiring immobilization (see concession agreement § 7.6(c)); and

(4) The City's permitting of parking by "Exempt Persons" (*e.g.*, handicapped parking) resulting in losses to CPM exceeding a 6% threshold of annual "Metered Parking Revenues" (see concession agreement §§ 1.1, 7.11).

¶ 12 In addition to these compensation events triggering the City's payment of concession compensation to CPM, the City is required under sections 7.5 and 7.8(c) of the concession agreement to make "City Settlement Payment[s]" every fiscal quarter to reimburse CPM for all losses sustained as a result of "Required Closure[s]" of metered parking spaces, which include: "street closures, the closure of a street to vehicular traffic, emergency parking bans, weather related closures, sidewalk closures related to building construction, sidewalk construction or repair, street construction or repair, utility work and similar activities." See concession agreement § 1.1 (definition of "Required Closure").

¶ 13 Also, the City is required under section 14.3(a) of the concession agreement to make "Reserved Powers Adverse Action payments" to CPM when the City's exercise of its reserved powers has a "material adverse effect on the fair market value of the Concessionaire Interest that cannot be compensated fully under the provisions of Article 7." If compensation owed under a "Reserved Powers Adverse Action" exceeds 25% of the value of the parking meter system, CPM retains the right under section 14.3(e) to terminate the concession agreement and receive the full market value of the parking meter system for the remainder of the term.

¶ 14                                   II. Plaintiffs' Suit
¶ 15                           A. Plaintiffs' Initial Complaint
¶ 16 Plaintiffs, Aviva Patt, a Chicago taxpayer, and the Independent Voters of Illinois Independent Precinct Organization, an association representing the interests of Chicago taxpayers, commenced this action on August 19, 2009, with a petition for leave to file a complaint to enjoin the City and state comptroller and the Secretary of State from making any further "expenditures of funds" pursuant to the concession agreement. The complaint based the request for injunctive relief on claims that certain provisions of the concession agreement: violate article VIII, section 1(a), and article VII, section 6(a), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VIII, § 1(a), art. VII, § 6(a)) (which we will discuss later in this opinion); illegally lease the City's parking meter system; and illegally deprive future Chicago city councils from being able to exercise authority over the parking meter system. CPM was not named as a defendant.

¶ 17                          B. Plaintiffs' First-Amended Complaint
¶ 18 The circuit court granted plaintiffs' petition on the condition that plaintiffs file an amended complaint by September 18, 2009, that did not name the Secretary of State. Plaintiffs filed an amended complaint on September 17, 2009, naming only the City and state comptroller as defendants. The City comptroller moved to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)). The circuit court granted the motion to dismiss

but gave plaintiffs leave to replead.

¶ 19                    C. Plaintiffs' Second-Amended Complaint

¶ 20        On April 31, 2010, plaintiffs filed a second-amended complaint against the City and State comptroller. Plaintiffs attached the concession agreement to the second-amended complaint. Plaintiffs alleged in pertinent part that pursuant to the City's obligation under section 7.6(a) of the concession agreement to "establish, maintain and undertake procedures for the enforcement of parking rules and regulations that are designed to deter parking violations," the City spends public funds to enforce CPM's private parking meters by issuing parking tickets, booting vehicles, and mailing notices of violations for collection of the unpaid private debts. Plaintiffs contended section 7.6(a) of the concession agreement thereby violates article VIII, section 1(a), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VIII, § 1(a)) (hereinafter, the public purpose provision), which requires that public funds be spent only for public purposes. On November 4, 2010, the circuit court dismissed this claim pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2010)). The circuit court denied the motion to dismiss the other claims in plaintiffs' second-amended complaint.

¶ 21             D. Plaintiffs' Third- , Fourth- , and Fifth-Amended Complaints

¶ 22        On November 5, 2010, plaintiffs filed their third-amended complaint against the City and State comptroller. On May 5, 2011, the State Comptroller was voluntarily dismissed. On July 29, 2011, plaintiffs sought leave to amend the complaint to join CPM as a necessary party. CPM did not object, and plaintiffs subsequently filed their fourth-amended complaint against the City comptroller and CPM on September 16, 2011. The fourth-amended complaint also named the State Comptroller as a defendant and asserted claims for injunctive relief against her even though she had been voluntarily dismissed. Plaintiffs filed a fifth-amended complaint against the City and State comptroller and CPM on September 29, 2011. In a footnote in their fifth-amended complaint, plaintiffs stated:

> "In order to reserve Plaintiffs' ability to assert on appeal, counts that have been dismissed, voluntarily or involuntarily, remain in the Fifth Amended Complaint. Accordingly, allegations against Defendant State Comptroller Judy Baar Topinka, who was voluntarily dismissed from this action, without prejudice, by Plaintiffs on May 5, 2011, remain in this Complaint, although the State is not required to answer."

¶ 23                    E. Plaintiffs' Sixth-Amended Complaint

¶ 24        On November 18, 2011, plaintiffs filed the operative sixth-amended complaint against the City and State comptroller and CPM. Plaintiffs again asserted in a footnote that although the State Comptroller had been voluntarily dismissed, the allegations against her had been repleaded in order to preserve them for appellate review.

¶ 25        In their sixth-amended complaint, plaintiffs contended they had "common law taxpayer standing" to sue the City and State comptroller, as well as "common law taxpayer derivative standing" to sue CPM on the City's behalf. Plaintiffs repleaded their previously dismissed allegation that section 7.6(a) of the concession agreement violates the public purpose provision of the Illinois Constitution in order to preserve appellate review of the earlier dismissal order. See, *e.g.*, *Ottawa Savings Bank v. JDI Loans, Inc.*, 374 Ill. App. 3d 394, 399

(2007). Plaintiffs further alleged that sections 3.1(a), 3.2(e), 4.6, and 7.6(b) of the concession agreement (which was attached to the sixth-amended complaint) violate the public purpose provision of the Illinois Constitution.

¶ 26      Specifically, plaintiffs contended section 3.1(a) violates the public purpose provision by unconstitutionally requiring the City to spend public funds to defend private claims against CPM. Section 3.1(a) states in pertinent part:

> "The City shall, at all times during the Term, defend *** the rights granted to the Concessionaire hereunder, or any portion thereof, against any Person claiming any interest adverse to the City or the Concessionaire in the Metered Parking System, or any portion thereof, or the Reserved Powers of the City, except where such adverse interest arises as a result of the act, omission, negligence, misconduct or violation of Law of the Concessionaire, its Affiliates or their respective Representatives."

Plaintiffs alleged section 3.2(e) of the concession agreement violates the public purpose provision by illegally delegating the City's police power to issue parking tickets and citations. Section 3.2(e) states in pertinent part: "The Concessionaire shall have the right, at its sole cost and expense, to issue parking tickets or citations for violations of the parking rules and regulations with respect to the Concession Metered Parking Spaces ***."

¶ 27      Plaintiffs alleged section 4.6 of the concession agreement violates the public purpose provision by obligating the City to use public funds to reimburse CPM for lost maintenance, repairs and expenses in relation to the private parking meters. Section 4.6 states in pertinent part:

> "The City shall reimburse the Concessionaire for all additional operating and maintenance costs and expenses incurred by the Concessionaire in relation to resurfacing, de-icing, snow removal or insurance premiums as a result of complying with its obligations under paragraphs, 6, 8, 9 and 10 under the heading 'Concession Parking Lot Maintenance, Repair and Improvements' of the Operating Standards, in relation to any Concession Parking Lots that were not Concession Parking Lots as of the Closing Date. The City shall reimburse all costs of sub-surface capital improvements to Concession Parking Lots that are undertaken by the Concessionaire in order to comply with the requirements of Chapter 11-18 of the Municipal Code."

¶ 28      Plaintiffs alleged section 7.6(b) violates the public purpose provision by obligating the City to spend public funds to enforce parking meter tickets issued by CPM as if they were issued by the City. Section 7.6(b) states in pertinent part:

> "In the administration of its vehicle immobilization program, the City will not discriminate between tickets issued for metered parking violations and tickets issued for other parking violations or between tickets issued by the City and tickets issued by the Concessionaire pursuant to section 3.2(e)."

¶ 29      Plaintiffs also alleged in pertinent part that article 7 and section 14.3 of the concession agreement, which require the City to make payments to CPM to maintain the benefit of the parties' bargain in the event the City exercises its reserved authority in ways that deprive CPM of vested concession rights for which it has already paid, constitutes an unlawful delegation of the City's reserved police power in violation of article VII, section 6(a), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VII, § 6(a)). Article VII, section 6(a), states:

"Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 30    Plaintiffs asked the circuit court to:

"a. Find and declare illegal or unconstitutional the described provisions of the Concession Agreement;

b. Enjoin the City of Chicago Comptroller from making further expenditures of public funds to enforce the privatized parking meter system;

c. Order CPM to reimburse the City for previous compensation payments received by CPM, as expenditures of public funds made pursuant to the Concession Agreement in violation of Illinois law;

d. Order an accounting and the imposition of a constructive trust upon the public funds illegally disbursed to CPM as a result of the City's obligations under the illegal Concession Agreement;

e. Enjoin the Illinois State Comptroller from making expenditures in connection with the Illinois Secretary of State impairing Illinois State driver licenses based on violations arising from the City's privatized parking meter system;

f. Award Plaintiffs' counsel attorneys' fees and costs pursuant to 740 ILCS 23/5(c)(2) 'to enforce a right arising under the Illinois Constitution'; and

g. Grant any other relief as the court deems equitable and proper."

¶ 31                        III. Summary Judgment Proceedings

¶ 32    The parties filed cross-motions for summary judgment on plaintiffs' sixth-amended complaint. In the course of the summary judgment proceedings, the circuit court ruled that plaintiffs had direct taxpayer standing to sue the City comptroller for an injunction prohibiting him from paying monies to CPM under the concession agreement, as well as standing to join CPM as "a necessary party for purposes of [that] relief." The circuit court ruled that plaintiffs lacked derivative standing to pursue monetary relief on behalf of the City. Subsequently, on the merits, the circuit court granted summary judgment in favor of defendants on plaintiffs' sixth-amended complaint.

¶ 33                        IV. Appeal and Cross-Appeal

¶ 34    Plaintiffs appealed from the dismissal and summary judgment orders. CPM filed a conditional cross-appeal from the circuit court's finding that plaintiffs had direct standing to assert the claims for injunctive relief alleged in their sixth-amended complaint against the City comptroller and against CPM as a necessary party.

¶ 35                        A. Appeal of the Section 2-615 Dismissal Order

¶ 36    First, we address plaintiffs' appeal from the November 4, 2010, order granting the City comptroller's section 2-615 motion to dismiss their claim in the second-amended complaint that section 7.6(a) of the concession agreement violates the public purpose provision of the Illinois Constitution.

¶ 37    A motion to dismiss under section 2-615 raises an issue as to the legal sufficiency of the complaint based on deficiencies on the face of the complaint. *Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 382 (2004). In considering such a motion to dismiss, a court must determine " 'whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted.' " *Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434, 438 (2011) (quoting *Canel v. Topinka*, 212 Ill. 2d 311, 317 (2004)). All well-pleaded facts must be taken as true. *Unterschuetz v. City of Chicago*, 346 Ill. App. 3d 65, 68-69 (2004). Exhibits attached to the complaint are considered part of the pleadings. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 431 (2004). We review an order granting a section 2-615 dismissal *de novo*. *Seip*, 408 Ill. App. 3d at 439.

¶ 38    The concession agreement at issue here, which was attached to the second-amended complaint, was adopted and implemented by municipal ordinance. "In construing the validity of a municipal ordinance, the same rules are applied as those which govern the construction of statutes. [Citation.] Statutes are presumed constitutional, and the burden of rebutting that presumption is on the party challenging the validity of the statute to clearly demonstrate a constitutional violation. [Citation.] This court has a duty to uphold the constitutionality of a statute when reasonably possible [citation], and, therefore, if a statute's construction is doubtful, a court will resolve the doubt in favor of the statute's validity." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306-07 (2008).

¶ 39    Our supreme court has set forth the standards for considering a challenge under the public purpose provision:

> "Article VIII, section 1, of the Illinois Constitution of 1970 provides that [p]ublic funds, property or credit shall be used only for public purposes. Ill. Const. 1970, art. VIII, § 1. [I]n order to proceed under article VIII, section 1(a) of the Illinois Constitution, facts must be alleged indicating that governmental action has been taken which directly benefits a private interest *without a corresponding public benefit ***.* [Citation.] In *Friends of the Parks*, we reiterated the well-settled principles regarding a public purpose:
>
> > This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide. [Citations.] In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. [Citations.] ***
>
> We have further expressed:
>
> > What is a public purpose is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society. [Citations.] Moreover, [t]he power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of public money. [Citation.] The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public

purpose. [Citations.]" (Emphasis added and internal quotation marks omitted.) *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 85-86 (2008).

¶ 40 Applying these standards, the supreme court in *Giannoulias* rejected a public purpose challenge to the law imposing a surcharge on four riverboat casinos even though five private horse racing tracks received all the revenue from the surcharge, because redistribution of the surcharge funds had the public benefit of supporting the horse racing industry and its 35,000 employees. *Id*. at 85-90. See also *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 325 (2003) (the supreme court rejected a public purpose challenge to a statute authorizing the use of public funds to renovate Soldier Field even though the Chicago Bears, a private entity, would benefit therefrom, holding that "[a] financial benefit accruing to the Bears, standing alone, does not diminish the fact that the renovated Soldier Field will be used and enjoyed by the public for a wide variety of public purposes").

¶ 41 In the present case, the city council enacted an ordinance amending the Chicago Municipal Code to authorize CPM to administer the metered parking system in accordance with the concession agreement. The ordinance expressly found that the concession agreement "is in the best interests of the residents of the City and desirable for the welfare of its government and affairs." Chicago City Council, Journal of Council Proceedings, Dec. 4, 2008, at 50508. The standards set forth in *Giannoulias* require us to defer to these legislative findings in the ordinance unless plaintiffs have pleaded facts showing that the findings are evasive and that the challenged provision in the concession agreement (section 7.6(a)) directly benefits a private interest without a corresponding public benefit. *Giannoulias*, 231 Ill. 2d at 85.

¶ 42 Section 7.6(a) of the concession agreement requires the City to enforce parking rules and regulations, thereby benefiting CPM by deterring the nonpayment of parking meter fees. Plaintiffs allege that the City's enforcement of parking rules and regulations benefits CPM only, and not the public, and therefore that section 7.6(a) violates the public purpose provision. Our reading of section 7.6(a), which was attached to the second-amended complaint and constitutes part of the pleadings for purposes of the section 2-615 motion to dismiss (*Bajwa*, 208 Ill. 2d at 431), indicates otherwise. Specifically, our reading of section 7.6(a) reveals that although the enforcement of parking rules and regulations will benefit CPM, a private interest, by deterring the nonpayment of parking meter fees going to CPM, said enforcement also has a public benefit where it will lead to the imposition of fines for parking meter violations, all of which monies goes to the City, *not* to CPM, under section 7.6(a) and can be used for the benefit of the public. Our reading of section 7.6(a) also indicates that the enforcement of parking rules and regulations thereunder serves another public purpose, namely, it creates incentives for motorists to comply with parking restrictions and move their vehicles so other motorists (*i.e*., members of the public) can park in the vacated spaces, enabling them to engage in a variety of activities such as shopping and dining, which in turn benefits the proprietors thereof (other members of the public). In addition, our supreme court has held that the enforcement of parking rules and regulations constitutes regulation of traffic on the streets (see *City of Bloomington v. Wirrick*, 381 Ill. 347, 359-60 (1942)), and that "the regulation of streets and traffic is in the interest of public health, safety, welfare, convenience and necessity, and thus for a public purpose." *Poole v. City of Kankakee*, 406 Ill. 521, 527-28 (1950)).

¶ 43    On this record, and in accordance with *Giannoulias* and *Friends of the Parks*, we cannot say that plaintiffs have pleaded facts showing that the legislative finding that the concession agreement (including section 7.6(a)) is in the best interests of the City residents and desirable for the welfare of its government and affairs was an evasion and that CPM benefited alone without a corresponding public benefit. Accordingly, even viewing section 7.6(a) of the concession agreement in isolation, plaintiffs failed to state a cause of action that section 7.6(a) violates the public purpose provision.

¶ 44    We need not view section 7.6(a) in isolation, though, as "[i]t is a basic tenet of contract construction that contracts are to be read as a whole and that each part is to be read in light of the others." *Village of Oak Lawn v. Faber*, 378 Ill. App. 3d 458, 473-74 (2007). Reading the contract as a whole, which we may for purposes of considering the section 2-615 dismissal order because it was attached to the second-amended complaint, we note that section 2.1 of the concession agreement is the provision under which CPM paid the City $1,156,500,000 which are monies that can be used for the public and not merely for the benefit of CPM and which plainly constitutes a significant public benefit.

¶ 45    Plaintiffs argue that *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225 (2002) (*SWIDA*), holds that the mere receipt of money by the City pursuant to the concession agreement does not reflect a valid public purpose or benefit. Plaintiffs misread *SWIDA*. Southwestern Illinois Development Authority (SWIDA) was a municipal corporation whose statutory duty was to assist in the development, construction and acquisition of industrial, commercial, housing or residential projects within Madison and St. Clair Counties. *Id*. at 227-28. SWIDA was empowered to issue bonds for the purpose of acquiring, improving or developing projects, and also had the authority to acquire property by condemnation. *Id*. at 228.

¶ 46    In June 1996, SWIDA issued $21.5 million in taxable sports facility revenue bonds, the proceeds of which were lent to Gateway International Motorsports Corporation (Gateway) to finance the development of a racetrack. *Id*. In 1998, Gateway increased the racetrack's seating capacity and asked SWIDA to use its quick-take eminent domain powers to acquire nearby land owned by National City Environmental, L.L.C., and St. Louis Auto Shredding Company (collectively NCE) for the purposes of expanded parking facilities. *Id*. at 229. Gateway paid SWIDA an application fee of $2,500, and the sum of $10,000 to be applied toward SWIDA's sliding-scale fee of 6% to 10% of the acquisition price of the property being condemned. *Id*. at 229-30. Gateway also agreed to pay SWIDA's expenses, including the acquisition price of the property ($900,000), and certain other costs associated with the quick-take process. *Id*. at 230, 234.

¶ 47    SWIDA filed a complaint in the circuit court of St. Clair County seeking condemnation of, and acquisition of fee simple title to, the property. *Id*. at 231. The circuit court held a quick-take hearing and ruled in SWIDA's favor. *Id*. at 232. The circuit court entered an order vesting SWIDA with title to the property in fee simple and granting it the right of immediate possession of the property. *Id*. at 234. SWIDA conveyed title of the property to Gateway. *Id*. NCE appealed the circuit court's order, and the appellate court reversed, holding that SWIDA had exceeded its constitutional authority by taking NCE's land by eminent domain. *Id*. SWIDA's petition for leave to appeal to the supreme court was granted. *Id*. at 234-35.

¶ 48    The supreme court affirmed the decision of the appellate court. *Id*. at 235. The supreme court noted that "[t]he right of a sovereign to condemn private property is limited to takings

for a public use" (*id.*) and that the controlling issue was "whether SWIDA exceeded the boundaries of constitutional principles and its authority by transferring the property to a private party for a profit when the property is not put to a public use" (*id.* at 236).

¶ 49    The supreme court ultimately held that the taking bestowed a purely private benefit on Gateway and therefore that SWIDA exceeded its constitutional authority in taking NCE's land by eminent domain. *Id.* at 236-42.

¶ 50    The supreme court never specifically addressed whether the monies SWIDA received from Gateway (approximately $1 million) for purposes of condemning NCE's land constituted a public benefit. Even assuming that the supreme court implicitly held that the approximately $1 million received by SWIDA did not constitute a public benefit, such a holding has no application here where the monies SWIDA received from Gateway essentially covered SWIDA's costs associated with the condemnation of NCE's land for Gateway's benefit and did not constitute funds to be used for members of the public other than Gateway. By contrast, the City, here, received *over $1.15 billion* from CPM under the concession agreement to be used for the benefit of the public and not merely to cover the City's costs in implementing the agreement. Accordingly, *SWIDA* is inapposite.

¶ 51    In addition to providing that CPM would pay the City over $1.15 billion, section 2.1 of the concession agreement is also the provision under which CPM took over the obligation and expense of operating, maintaining and updating the metered parking system for 75 years. Pursuant thereto, CPM also took on the corresponding risk that metered parking revenue will decline due to reduced demand or other market forces. The shifting of that risk from the City to CPM is another public benefit.[1]

¶ 52    Given the public benefits provided by the concession agreement, plaintiffs' claim that section 7.6(a) violates the public purpose provision was rightly dismissed.

¶ 53    Plaintiffs argue, though, that *O'Fallon Development Co. v. City of O'Fallon*, 43 Ill. App. 3d 348 (1976), compels a different result. In *O'Fallon*, a municipality displayed private advertising on a water tower it owned, but received no compensation or any other benefit for the advertising. *City of O'Fallon*, 43 Ill. App. 3d at 350. On whether the municipality violated the public purpose provision, the appellate court stated:

> "We believe the crucial test is whether the attempted use of the municipal property subserves the public interest and benefits a private individual or corporation only incidentally. If the private benefits are purely incidental to the public purposes of the act, then [the public-purpose provision] is not violated." *Id.* at 355.

---

[1]The City comptroller argues that yet another public benefit the concession agreement confers is evidenced by the affidavit of John S. Strong, Ph.D., a professor of finance and economics at the Mason School of Business, College of William and Mary. In his affidavit, Dr. Strong testified to CPM's installation, in accordance with section 4.4 of the concession agreement, of the more than 4,600 new fee-collection devices that accept payment by credit and debit cards in addition to cash and allow customers to purchase portable time to park in multiple meter locations without paying duplicative meter fees. Dr. Strong's affidavit is outside the complaint and may not be considered when addressing the section 2-615 dismissal order. However, Dr. Strong's affidavit *is* relevant when considering, in the next section of this opinion, whether the circuit court properly granted summary judgment for defendants on plaintiffs' allegations regarding whether the "remainder" of the concession agreement violates the public purpose provision.

¶ 54    Plaintiffs here argue that the private benefits to CPM were not "purely incidental" to the public purposes served and, thus, under *City of O'Fallon*, plaintiffs stated a cause of action for violation of the public purpose provision. We disagree because subsequent to *City of O'Fallon*, and as discussed earlier in this opinion, our supreme court held that we must defer to the legislative findings in the ordinance that the concession agreement "is in the best interests of the residents of the City and desirable for the welfare of its government and affairs" unless plaintiffs have pleaded facts showing that the findings are evasive and that the challenged provision directly benefits a private interest without a corresponding public benefit. See *Giannoulias*, 231 Ill. 2d at 85-86. As we have discussed, plaintiffs failed to adequately plead such facts. Further, we note that in *City of O'Fallon*, the appellate court ultimately found a violation of the public purpose provision because "[*n*]*o* public purpose is furthered and *no* public benefit results from [the] private advertising" on the water tower. (Emphases added.) *City of O'Fallon*, 43 Ill. App. 3d at 355. By contrast, numerous public benefits result from the concession agreement. Accordingly, we affirm the order dismissing plaintiffs' claim in their second-amended complaint that section 7.6(a) of the concession agreement violates the public purpose provision.

¶ 55                           B. Appeal of the Summary Judgment Order
¶ 56               1. The Grant of Summary Judgment on Plaintiffs' Allegations
                       That the "Remainder" of the Concession Agreement
                             Violates the Public Purpose Provision

¶ 57    Plaintiffs argue that the circuit court erred by granting summary judgment for defendants on the claims in plaintiffs' sixth-amended complaint that the "remainder" of the concession agreement violates the public purpose provision.

¶ 58    "Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *County of Cook v. Village of Bridgeview*, 2014 IL App (1st) 122164, ¶ 10. "As in this case, where the parties file cross-motions for summary judgment, they invite the court to decide the issues presented as a matter of law." *Id*. "Our review of the trial court's order granting summary judgment is *de novo*." *Id*.

¶ 59    In their sixth-amended complaint, plaintiffs identified only four sections of the concession agreement (other than section 7.6(a)) as allegedly violating the public purpose provision, specifically, sections 3.1(a), 3.2(e), 4.6 and 7.6(b). In their appellants' brief, plaintiffs do not focus their analysis on how sections 3.1(a), 3.2(e), 4.6 and 7.6(b) violate the public purpose provision; rather, plaintiffs make the broad claim on appeal that "the remainder" of the concession agreement, *i.e.*, every concession provision other than section 7.6(a), violates the public purpose provision. Plaintiffs' failure to specifically address, on appeal, how sections 3.1(a), 3.2(e), 4.6 and 7.6(b) violate the public purpose provision, and their failure to plead in their sixth-amended complaint that the "remainder" of the concession agreement violates the public purpose provision, waives these issues on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, ¶ 25.

- 13 -

¶ 60       Regardless, plaintiffs' public-purpose challenge to all the provisions in the concession agreement fails on the merits. As we discussed earlier in this opinion, the concession agreement provides numerous public benefits, specifically: (1) pursuant to section 2.1, CPM paid the City more than $1.15 billion, which the City has used to set up a $400 million revenue replacement fund to generate $20 million a year in expected annual interest that could be used for the City's ongoing operations, plus a $100 million human infrastructure fund to support programs aimed at providing resources to the City's businesses, homeowners and residents most in need, and a $325 million mid-term reserve fund to supplement revenues in the City's corporate fund through 2012; (2) pursuant to section 2.1, the risk that metered parking revenue will decline over the 75-year term of the concession agreement has been shifted from the City to CPM; (3) pursuant to section 4.4, CPM has installed more than 4,600 new fee-collection devices that accept payment by credit and debit cards and allow customers to purchase portable time; and (4) pursuant to section 7.6(a), monies paid for fines for parking meter violations go to the City and can be used for the benefit of the public, and motorists have the incentive to comply with parking restrictions and move their vehicles so other motorists can park in the vacated spaces. The City's annual appropriations ordinance for year 2010 estimated that the City would receive almost $263 million in revenue that year from "fines, forfeitures, and penalties" while spending less than $9.8 million to pay the salaries of personnel who perform "Parking Enforcement" and "Boot and Tow" functions. Given all these public benefits arising from the concession agreement, plaintiffs have failed to show that the legislative findings that the concession agreement is in the best interests of the residents of the City and desirable for the welfare of its government and affairs are evasive and that the concession agreement directly benefits CPM without a corresponding public benefit. See *Giannoulis*, 231 Ill. 2d at 85-86.

¶ 61       Plaintiffs make the policy argument that the concession agreement was a bad one for the City because the parking meter fees paid to CPM over the course of the 75-year term of the concession agreement will vastly exceed the $1,156,500,000 paid to the City by CPM. Even if plaintiffs' assessment of CPM's return from the concession agreement is true, we note (as discussed above) that the City receives more benefits than just the $1,156,500,000 payment; it also receives the fines generated from parking meter violations for the 75-year term. The City received more than $200 million in fines, forfeitures and penalties for the year 2010 alone. The City also receives the following additional benefits: more than 4,600 new and improved fee-collection devices; the shifting to CPM of the risk that metered parking revenue will decline over the 75-year term; as well as the shifting to CPM of the duty to operate and maintain the parking meter system.

¶ 62       That said, we certainly understand the argument made by plaintiffs that the concession agreement transferring the City's control of the metered parking system to CPM for 75 years should not have been so hastily entered into and that the accompanying Metered Parking System Ordinance should not have been enacted. However, arguments about why the concession was a bad deal for the City do not provide a basis for invalidating the concession agreement and the adopting Ordinance. See *Condominium Ass'n of Commonwealth Plaza v. City of Chicago*, 399 Ill. App. 3d 32, 45 (2010) (holding that policy arguments are matters for the legislature and not the courts); *Williams v. Pryor*, 240 F.3d 944, 952 (11th Cir. 2001) (holding that a court "does not invalidate bad or foolish policies, only unconstitutional ones"); and *New York State Board of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008)

(Stevens, J., concurring, joined by Souter, J.) (quoting Thurgood Marshall: " 'The Constitution does not prohibit legislatures from enacting stupid laws.' ").

¶ 63    Accordingly, we affirm the grant of summary judgment in favor of defendants on plaintiffs' claims that the "remainder" of the concession agreement violates the public purpose provision.

¶ 64                    2. The Grant of Summary Judgment on Plaintiffs' Allegations That
                    Article 7 and Section 14.3 of the Concession Agreement Violate
                        the Home Rule Provision of the Illinois Constitution

¶ 65    Plaintiffs argue that the circuit court erred by granting summary judgment in favor of defendants on plaintiffs' claims in the sixth-amended complaint that article 7 and section 14.3 of the concession agreement violate article VII, section 6(a), of the Illinois Constitution (the home rule provision).

¶ 66    "Article VII, section 6(a), of the 1970 Constitution placed in the hands of home rule units the power to act under the police power and specifically allows the home rule unit 'to regulate for the protection of the public health, safety, morals and welfare.' (Ill. Const. 1970, art. VII, sec. 6(a).)" *City of Evanston v. Create, Inc*., 85 Ill. 2d 101, 115 (1981).

¶ 67    Plaintiffs here argue that article 7 and section 14.3 of the concession agreement violate the home rule provision by requiring the City to pay compensation to CPM if the City exercises its police powers in certain ways that reduce metered parking revenue, thereby "chilling" the City's exercise of said police powers. In other words, plaintiffs argue that article 7 and section 14.3 of the concession agreement violate the home rule provision by unlawfully conditioning the exercise of the City's reserved police powers upon compensation to CPM. The circuit court rejected this claim and granted summary judgment in favor of defendants, finding that the City's exercise of its police powers need not be "costless," *i.e*., that the home rule provision is not violated by the compensation provisions of article 7 and section 14.3.

¶ 68    We agree with the circuit court. *Poole v. City of Kankakee*, 406 Ill. 521 (1950), is dispositive. In *Poole*, the city of Kankakee passed an ordinance providing for the issue of $430,000 in " 'Motor Vehicle Parking System Revenue Bonds' " for the stated purpose of acquiring eight tracts of real estate to be used for the operation of off-street vehicle parking lots in the business section of the city. *Id*. at 523. Plaintiffs filed a complaint seeking to enjoin the city, its mayor and clerk from proceeding under the ordinance. *Id*. The circuit court ultimately enjoined the city and its officers from proceeding under the ordinance. *Id*. at 524.

¶ 69    On appeal, the relevant issue was whether the city, by section 13 of the ordinance, had contracted away to the bondholders its right of police power until such bonds are paid. *Id*. at 535. This assertion was based on the language of section 13 which says "after the issuance of the bonds no changes ***, be made to this Ordinance in any manner except in accordance with the provisions of this Ordinance, or until such time as all of said bonds issued hereunder and the interest thereon shall be paid in full." (Internal quotation marks omitted.) *Id*. Plaintiffs construed this provision as leaving the city "absolutely powerless to act in the case of future change or emergency." *Id*.

¶ 70    The supreme court determined that the question it must answer was whether the ordinance "prevent[ed]" the city's exercise of police power. *Id*. at 536. The supreme court

answered this question in the negative, noting that: section 10(d) of the ordinance provides that the city may change the location of the parking meters whenever necessary for traffic regulation and control; section 10(a) provides that the city may withdraw any existing off-street parking facility for the purposes of erecting multiple level parking structures; section 10(b) provides that the city may in its discretion provide free off-street parking in an area not to exceed 25% of the square footage of all the facilities of the city; and section 5 reserves the right to redeem the bonds before maturity. *Id.* at 535.

¶ 71    The supreme court concluded that "[i]t is apparent that the city has reserved unto itself a wide discretion in the matter of location, regulation and control," and, thus, the ordinance did not "constitute a surrender of its police power." *Id.* at 535-36.

¶ 72    In the present case, the concession agreement is even more favorable to the City than the ordinance at issue in *Poole*, as section 3.1(a) of the concession agreement expressly reserves the City's authority to exercise all of its police powers over the metered parking system. The police powers reserved to the City are specifically defined to include: the power to designate the number and location of metered parking spaces and to add and remove metered parking spaces; the power to establish and revise from time to time the schedule of metered parking fees for the use of metered parking spaces; the power to establish and revise from time to time the periods of operation and periods of stay of metered parking spaces; the power to establish a schedule of fines for parking violations; the power to administer a system for the adjudication and enforcement of parking violations and for collection of parking violation fines; and the power to establish and administer peak period pricing, congestion pricing or other similar plans. See concession agreement § 1.1 (definition of the City's "Reserved Powers"). Even more so than in *Poole*, the concession agreement here reserves to the City a wide discretion in the matter of the location, regulation and control of the metered parking spaces and thus does not constitute a surrender of the City's police powers over the parking meter system.

¶ 73    Plaintiffs argue that *Poole* is distinguishable because there the ordinance merely allowed the income from existing parking meters to be pledged as security for the bonds issued to finance the acquisition of the new parking facilities (*Poole*, 406 Ill. at 524), whereas here the concession agreement requires the City to directly reimburse CPM for the City's exercise of any police power actions resulting in losses of parking meter revenue. This is a distinction without a difference. The relevant question in *Poole* was whether the ordinance at issue prevented the city of Kankakee from exercising its police powers until the bonds were paid (*id.* at 535), and the supreme court answered that question in the negative, noting that various provisions of the ordinance preserved Kankakee's ability to exercise its police powers. *Id.* at 535-36. Similarly, here, the City has not surrendered its police powers over the parking meter system by entering into the concession agreement; to the contrary, under section 3.1(a) of the concession agreement, the City expressly retains *all* of said powers. The circuit court correctly granted summary judgment for defendants on plaintiffs' claims that article 7 and section 14.3 of the concession agreement violate the home rule provision of the Illinois Constitution.

¶ 74    Plaintiffs also argue that *Poole* is distinguishable because the supreme court expressly noted there that Kankakee had not bound itself to "fix any specific unalterable amount of fee or charge" for the use of the off-street parking facility (*Poole*, 406 Ill. at 536), whereas here, according to plaintiffs, the City has bound itself under section 7.1 of the concession

- 16 -

agreement to fix a specific, unalterable fee or charge for use of the parking meters. Plaintiffs contend that by contracting to fix an unalterable fee for use of the parking meters, the City has effectively contracted away its police powers over the parking meter system. Plaintiffs' argument is unavailing as it misreads section 7.1 of the concession agreement, which *does* allow the City to change the schedule of parking fees. See concession agreement § 7.1 ("The City has (and shall retain during the Term) the Reserved Power to establish and *revise* from time to time the Metered Parking Fees that shall be imposed and charged in respect of motor vehicles using Metered Parking Spaces, including Concession Metered Parking Spaces and Reserve Metered Parking Spaces." (Emphasis added.)).

¶ 75    Plaintiffs argue that *People ex rel. City of Chicago v. Chicago City Ry. Co.*, 324 Ill. 618 (1926), *Peoples Gas Light & Coke Co. v. City of Chicago*, 413 Ill. 457 (1952), and *North Park Public Water District v. Village of Machesney Park*, 216 Ill. App. 3d 936 (1990), compel a finding that article 7 and section 14.3 of the concession agreement violate the home rule provision. In *Chicago City Ry.*, a company installed railway tracks down the middle of 22nd Street in Chicago. *Chicago City Ry.*, 324 Ill. at 619. Later, the City developed plans to widen that street from its south edge but not from its north edge. *Id.* Under the City's plans, the tracks were to be relocated to the middle of the street after it was widened. *Id.* at 619-20. The contract between the City and the company did not specify whether the City would pay the company to perform the relocation. The supreme court held that the company would have to perform the relocation at its own expense. *Id.* at 624. Similarly, in *Peoples Gas* and *North Park*, a gas company and a water district installed equipment in the public ways of two municipalities. *Peoples Gas*, 413 Ill. at 459; *North Park*, 216 Ill. App. 3d at 937. In both cases, it became necessary for the utilities to relocate their equipment to accommodate public improvements. *Peoples Gas*, 413 Ill. at 460; *North Park*, 216 Ill. App. 3d at 937. No contract specified whether the municipalities would pay the utilities to perform such relocation. The courts held that the utilities would have to perform the relocations at their own expense. *Peoples Gas*, 413 Ill. at 462-76; *North Park*, 216 Ill. App. 3d at 941.

¶ 76    Neither *Chicago City Ry.*, *Peoples Gas*, nor *North Park* involved a contract such as the concession agreement at issue here, pursuant to which the City transferred its metered parking system to CPM for 75 years in exchange for over $1.15 billion and agreed under article 7 and section 14.3 to reimburse CPM for losses resulting from the exercise of police powers that reduce the metered parking revenue. Thus, neither *Chicago City Ry.*, *Peoples Gas*, nor *North Park*, had cause to consider whether such a contract violates the home rule provision by chilling the City's exercise of its police powers over the metered parking system. As discussed earlier in this opinion, we hold that the concession agreement, which was authorized by the Metered Parking System Ordinance, is in accordance with the home rule provision because the City expressly retains all its police powers over the parking meter system under section 3.1(a). Further, we note there has been no showing that article 7 and section 14.3 of the concession agreement have effectively prohibited the City from exercising its police powers over the metered parking system, nor has there been a showing that the City failed to exercise its police powers over the metered parking system because of a fear of any ensuing payments that would have to be made to CPM.

¶ 77    Plaintiffs next set out a series of miscellaneous arguments allegedly showing that, notwithstanding the City's express retention of its police powers over the parking meter system pursuant to section 3.1(a) of the concession agreement, section 14.3 and article 7 of

the concession agreement unconstitutionally "chill" the City's exercise of its police powers and thereby violate the home rule provision. Plaintiffs first contend that the concession agreement was recently amended "to avoid $20 million in annual 'true-up' [article 7 quarterly] payments to CPM" and that the City " 'paid' for this change by agreeing to substantially increase the operating hours of parking meters." (Emphasis omitted.) Plaintiffs offer no explanation for how this amendment chilled the City's exercise of its police powers, especially where the City *exercised* its police powers by increasing the parking meter hours.

¶ 78    Plaintiffs next argue that the compensation provisions of article 7 and section 14.3 have "created problems and disputes between the City and CPM over the scope of each other's authority to regulate the meter system." The only "problem" between CPM and the City for which plaintiffs provide a citation concerns the "[e]nforcement" of metered parking violations committed by motorists. Plaintiffs provide no explanation as to how the dispute over enforcement of metered parking violations has anything to do with their claim that section 14.3 and article 7 unconstitutionally chill the exercise of police powers by requiring the City to compensate CPM for reductions in metered parking revenue.

¶ 79    Plaintiffs argue that "[a]dditional problems have occurred when CPM's lack of compliance with its contractual obligations under the Agreement create public safety and regulation issues." (Emphasis omitted.) Plaintiffs fail to say how said "problems" show that the City is chilled in the exercise of its police powers by article 7 and section 14.3 of the concession agreement.

¶ 80    Plaintiffs argue that article 7 and section 14.3 of the concession agreement have prevented City legislators from taking desired actions in the public interest, thereby chilling the exercise of police powers. In support, plaintiffs cite a news article concerning the City's decision to forego a federally funded Bus Rapid Transit program. Contrary to plaintiffs' argument, though, the proposed federal grant (as evinced in the record on appeal) *required* the City to enter into "a long-term concession for its on-street parking meters." Thus, instead of being an impediment to the grant, the concession agreement with CPM was a *requirement*. Further, the article relied on is hearsay (*McCall v. Devine*, 334 Ill. App. 3d 192, 203 (2002)), which may not be considered on a motion for summary judgment (*Morris v. Ameritech Illinois*, 337 Ill. App. 3d 40, 46 (2003)), and, regardless, the article does not say the City decided to forego the grant because of the concession agreement with CPM. Rather, the article says that the City made an error on a part of the grant agreement.

¶ 81    Plaintiffs next observe that the City has made substantial compensation payments to CPM under article 7 of the concession agreement. However, this does not support plaintiffs' claim that the compensation provisions have a chilling effect on the City's exercise of its police powers over the parking meter system. To the contrary, the City made such article 7 payments precisely *as a result* of exercising said police powers. Such payments demonstrate that the City has, in fact, exercised its police powers to make changes to the metered parking system, for the benefit of the public, notwithstanding the concession agreement's compensation provisions.

¶ 82    Plaintiffs also argue that the 75-year length of the contract is "unlawful in itself, tying down subsequent legislatures for generations to come." Plaintiffs' argument is without merit. As this court has explained:

    "The parties agree that [Chicago's] city council is a continuing body, the existence of which never ceases by reason of a change of membership. The

- 18 -

continuing body concept serves the useful legal fiction needed to accomplish such desirable public policy considerations as protecting the contract rights of persons who had contracted with the previous municipal body ***." *Roti v. Washington*, 114 Ill. App. 3d 958, 969 (1983).

¶ 83    In conclusion, plaintiffs' miscellaneous arguments regarding how section 14.3 and article 7 of the concession agreement "chill" the City's exercise of its police powers over the parking meter system and violate the home rule provision are without merit and do not support reversal of the circuit court's entry of summary judgment in favor of defendants.

¶ 84    Plaintiffs also argue on appeal that section 15.1 of the concession agreement impermissibly requires the City to insure CPM against natural disasters, acts of terrorism or other circumstances outside of either party's control. We need not address this argument as plaintiffs failed to present this claim in their sixth-amended complaint. *Catom Trucking*, 2011 IL App (1st) 101146, ¶ 25.

¶ 85    Plaintiffs also cite the "unmistakability" doctrine set forth in *United States v. Winstar Corp.*, 518 U.S. 839 (1996). Plaintiffs state:

> "The unmistakability doctrine is [a] doctrine of constitutional avoidance, used as a shield to protect the government from contractual provisions that would require the government's relinquishment of sovereign powers. [Citation.] When applicable, contractual provisions which barter away the government's police powers in less than explicit or 'unmistakable' terms are interpreted to have no binding force or effect on the government."

¶ 86    As discussed earlier in this opinion, the concession agreement does *not* require the City to relinquish its police powers over the parking meter system. Accordingly, the unmistakability doctrine has no application here and does not compel reversal of the orders entered.

¶ 87    Plaintiffs cite law review articles critical of the concession agreement. Said articles are hearsay which may not be considered on a motion for summary judgment (*Morris*, 337 Ill. App. 3d at 46); further, as we discussed earlier in this opinion, policy arguments as to why the concession agreement was a bad one for the City are matters for the legislature and not the court. See *Condominium Ass'n of Commonwealth Plaza*, 399 Ill. App. 3d at 45.

¶ 88    During oral argument on this case, CPM argued that plaintiffs are making a facial challenge to the concession agreement and, as such, they must show that the concession agreement is incapable of constitutional application in any context. See *People v. Campbell*, 2014 IL App (1st) 112926, ¶ 56. Plaintiffs did not dispute that their challenge to the concession agreement is a facial one. Plaintiffs' facial challenge to the concession agreement fails because, as discussed earlier in this opinion, the concession agreement *is* capable of constitutional application.

¶ 89    The City of Chicago, as do other governmental units throughout the state and country, faces fiscal challenges. There is no doubt that when presented with an opportunity to receive over $1.15 billion to be put to use for the public purposes and benefit, the City saw a chance to ease its financial burdens. The concession agreement allowed the City to transfer responsibility for the upkeep and maintenance of the parking meters and the risk of fluctuating revenues from the meters. The City preserved its police power, although at a cost. The City also preserved its right to collect fines from the parking meter violations to be used for public purposes and which constitute millions in revenue. Despite these benefits received

by the City, the concession agreement has been criticized and subjected to healthy debate. We urge the City and the city council to debate and act wisely in the future when seeking to ease the financial crisis. In the present case, we have examined the concession agreement and examined the constitutional issues in the way we are required to do in an appeal from a section 2-615 dismissal order and from a summary judgment order.

¶ 90                                            V. CONCLUSION

¶ 91        For the foregoing reasons, we affirm the dismissal order and the summary judgment order. We recognize that "[c]ommon law taxpayer actions are of vital importance to the public at large" (*Simpson v. Tobin*, 367 N.W.2d 757, 768 (S.D. 1985)), and that the parties here spent considerable effort briefing whether the plaintiffs had standing to bring such an action here. However, as a result of our disposition of this case, we need not address the standing arguments or the conditional cross-appeal.

¶ 92        Affirmed.